[L. A. No. 6408. In Bank.—February 17, 1922.]

THOMAS HUGHES, Respondent, v. PACIFIC WHARF AND STORAGE COMPANY (a Corporation), Appellant.

[1] ACTION FOR SERVICES—COMPENSATION—REASONABLE VALUE.—In an action to recover a commission for services in superintending and overseeing the construction of a wharf and the dredging of a slip and approach, based upon the amount of expenditures thereon, where the pleadings admit the employment by defendant and it was stipulated that a certain amount was expended for certain specified purposes, defendant was bound to pay the reasonable

value of such services in the absence of a contract fixing the amount of compensation.

[2] CONTRACTS — CONSTRUCTION OF — CONDUCT OF PARTIES. — If a contract is definite and certain it is neither necessary nor proper to rely upon the conduct of the parties for its construction. Rules of construction are resorted to for the purpose of ascertaining what the contract really was, and if that matter is not in doubt, it is unnecessary to rely upon those considerations which obtain where the construction of the contract is in doubt.

[3] ID.—CONTRACT WITH CORPORATION FOR SERVICES—RATIFICATION.— Where the plaintiff informally made an arrangement with the directors of a corporation by which he was to superintend and oversee the construction of a wharf and the dredging of a slip and approach and these directors knew that he was performing the work that they had asked him to do and had agreed with him upon the amount of his compensation, with which knowledge they passed a resolution authorizing the execution of a formal contract for the supervision of the entire work, this resolution, coupled with the previous knowledge and consent of the directors and their subsequent retention of the services of the plaintiff and the payment to him for those services, may be deemed a ratification of the previous informal arrangement between the officers of the corporation and the plaintiff.

[4] ID.—CONSTRUCTION OF CONTRACT—CONDUCT OF PARTIES.—The fact that the account-books of the defendant corporation in such case were kept upon the theory that the plaintiff was only entitled to compensation for expenditures made after a certain date, that statements were rendered to the plaintiff upon that basis, that he accepted the payment accompanying such statements, and executed receipts in full from time to time based upon such statements, does not require a finding that the original intention of the parties was to confine the agreement for compensation to a percentage upon work done after the date referred to, where the directors had made an informal agreement long before that date and it had been acted upon by both parties before that time, and a resolution authorizing the execution of a formal contract for the employment was broad enough to cover all work done before as well as after the date of its passage.

[5] ID.—EVIDENCE—COPY OF LETTER—FOUNDATION.—In such a case sufficient foundation was laid for the introduction of a carbon copy of a letter from the corporation defendant to the plaintiff when a witness stated that he mailed the letter to the addressee thereof and based such testimony upon his invariable habit of mailing all such letters.

[6] ID.—REJECTION OF LETTER.—In such a case the exclusion of a letter written by the defendant corporation to the plaintiff, offered for the purpose of showing the contemporaneous construction of

the contract by the parties, could not have resulted in a miscarriage of justice where other evidence of greater weight upon the same subject and to the same effect as the letter in question was received in evidence.

[7] ID. — CONSTRUCTION OF CONTRACT — DECLARATIONS. — The mere declaration by one of the parties to a contract to the other to the effect that the actual amount due thereunder was an amount actually less than the amount that was really due would not be binding upon the other party to the contract as a construction of the contract, nor would the acceptance of a payment accompanying such a declaration be binding upon the party as such construction.

APPEAL from a judgment of the Superior Court of Los Angeles County. Lewis R. Works, Judge. Modified and affirmed.

The facts are stated in the opinion of the court.

W. N. Goodwin and Goodwin & Morgrage for Appellant.

G. P. Adams for Respondent.

WILBUR, J.—Plaintiff recovered judgment in the lower court and defendant appealed. The judgment was affirmed in Department and defendant's petition for rehearing was granted. We accept and adopt the defendant's statements with reference to the issues and evidence with certain exceptions to be hereafter noted. The statement is as follows:

"The action is to recover an agreed commission of five per cent on expenditures made by defendant in constructing a wharf and dredging a slip and its approach at Wilmington, in Los Angeles county. Plaintiff alleges that he was employed by defendant to superintend and oversee said work at an agreed compensation of five per cent of the money expended therefor; that such expenditures amounted to $236,830.59; that his commission was $11,841.53, of which $8,741.89 and no more had been paid. The prayer is for $3,099.64 and interest from October 8, 1912. Defendant answered admitting the employment of plaintiff to superintend the construction of the wharf, slip and approach; denied that it agreed to pay plaintiff five per cent upon expenditures made by it other than in dredging a slip, the approach thereto and constructing a wharf alongside of said slip. De-

nied that it expended in dredging said slip and approach and in constructing said wharf the sum of $236,830.21, or any other sum in excess of the sum of $140,249.21; or that it expended any sum of money whatever in excess of said last mentioned sum upon which it was understood or agreed that plaintiff should have or receive five per cent thereof as salary or commission.

"Denied that the sum of $3,099.64 or any other sum was due or owing to plaintiff.

"Defendant affirmatively alleged the passage of certain resolutions by its board of directors on June 21, 1910; that at the time said resolutions were passed plaintiff was a director and large stockholder in defendant corporation; that the formal contract referred to in said resolutions was never executed, but immediately after its passage Thomas Hughes took charge of the dredging of said slip, its approach and the construction of the wharf and continued in charge until October 8, 1912; that after the passage of said resolutions and up to October 8, 1912, defendant expended in dredging said slip, its approach and in constructing said wharf the sum of $140,249.21 and no more; that defendant has paid plaintiff five per cent of all expenditures made by it in said work between June 21, 1910, and October 8, 1912.

"Under these pleadings it rested upon plaintiff to establish that the contract covered all expenditures made by defendant up to October 8, 1912, or that $236,830.59 was expended in dredging the slip, its approach and constructing the wharf.

"The court found as a fact that defendant expended said sum for that purpose and under the supervision and direction of plaintiff and awarded him a commission on that basis

"These findings are attacked as unsupported by the evidence.

"The only evidence of a contract offered by plaintiff is found in the record at folio 35 et seq.  He testified that the conversations were principally with Mr. Bastable, but that there were conversations at the meetings when all the members of the board of directors were present.  He says he told them that the regular commission was ten per cent and that he would do it for half.  This he says was immediately after the dredge was completed, but he does not attempt to fix the date.  There is no testimony that the corporation ac-

cepted his proposition other than the inference to be drawn from the fact that he thereafter superintended the dredging and building of the wharf and the corporation paid him money.

"Defendant introduced the resolution of the board of directors passed June 21, 1910, in words as follows:

" 'It was moved by director Blankenhorn, seconded by director Epstein and unanimously passed that the president and secretary be and they are hereby authorized and directed for and on behalf of this corporation to execute a contract with Thomas Hughes for the payment by this corporation to said Thomas Hughes of five per cent of the money expended in dredging of slip No. 2 and the approach thereto, and the construction of the wharf alongside said slip No. 2.'

"Thomas Hughes was then a director of the corporation and was present at that meeting . . . ' '

During the trial the following stipulation with reference to the facts was entered into between the parties:

"It is stipulated that the defendant expended from the commencement of its work at San Pedro to October 8, 1912, the following sums of money for the following designated purposes: Dredging, $59,857.75; wharf No. 1, $85,319.30; electric energy, $24,555.78; warehouse No. 1, $6,699.65; earth filling, $40,248.65; engineering, $11,541.24; pile driver, $4,266.47; launch, $2,758.81; sheds, $817.21; board walk, $278.35; launch expense, $317.66; tools, $176.70; wharf insurance, $72.50.   Total, $236,810.07.

"It is stipulated that of this total of $236,810.07 there was expended by the company before June 21, 1910, the following amounts for the following purposes: Dredging, $3,375.47; wharf No. 1, $16,871.12; electric energy, $10,000; earth filling, $39,526.18; engineering, $2,658.75.   Total, $72,431.52.

"It is also stipulated that the expenditure for engineering after June 21, 1910, to October 8, 1912, were $8,782.49, and of this amount $8,741.99 was commissions on expenditures paid to plaintiff and charged to 'Engineering Account.'

"It is also stipulated that of the expenditures after June 21, 1910, to October 8, 1912, $6,699.65 was expended in the construction of 'Warehouse No. 1.' ' '

In addition to the summary thereof contained in the above statement, plaintiff testified as follows:

"Q. How did you come to commence work for them? A. They had no one to run the dredge and wanted a proposition from me. I told them the regular commission for such work was ten per cent, and I would do it for half, as I would have to employ a man to take my place in the Hughes Manufacturing Company, and that would just about pay my expenses. . . .

"Q. When did you commence work, Mr. Hughes? A. The dates I have not got, but that should show in the minutes. It was immediately after the dredge was completed, and I think the day after. . . .

"Q. Mr. Hughes, was any work done there except under your supervision? A. None whatever.

"Q. You prepared the plans for the wharf? A. Yes, sir.

"Q. And for the dredging? A. Yes, sir.

"Q. And they were all done under your supervision? A. And the warehouse.

"Q. And the warehouse—all done under your supervision? A. Yes, sir."

The appellant asserts that the plaintiff was present at the meeting of June 21, 1910, and voted for the above resolution. Plaintiff stated that he had no recollection of the passage of the resolution and knew nothing whatever about it. The minutes recite that he was present at the meeting and that the resolution was passed unanimously. Under this evidence, of course, the trial court could have taken the view that the plaintiff retired from the meeting before the passage of the resolution.

[1] The fundamental question upon appeal is whether or not there has been a miscarriage of justice. In considering that question in the case at bar we have the following situation: Plaintiff was employed by defendant to superintend and oversee the construction of a wharf and the dredging of a slip and approach, as is admitted in the pleadings. In the performance of this work it is stipulated that $236,830.21 was expended for certain specified purposes. It is shown by the testimony of the plaintiff that the agreed compensation was five per cent upon the expenditures, and the resolution of the board of directors stated that plaintiff's compensation was to be "five per cent of the money expended

in dredging of slip No. 2 and the approach thereto, and the construction of the wharf alongside said slip No. 2.'' There is no contradiction or denial of plaintiff's statement that ten per cent was the usual commission for such work. Under such circumstances the defendant was bound to pay the reasonable value of such services in the absence of a contract fixing the amount of his compensation. (*Bassett et al.* v. *Fairchild*, 132 Cal. 637 [52 L. R. A. 611, 64 Pac. 1082].) If it be conceded that the express contract to pay five per cent commission only related to expenditures made after June 21, 1910, the date of the resolution, the obligation to pay the reasonable value of the services theretofore rendered would remain and the result would either be the same or more favorable to the plaintiff.

It seems clear that there has been no miscarriage of justice in this case, but we will nevertheless further consider the questions presented by the appellant. Appellant's answer ''denies that it expended in dredging said slip and approach thereto, and in constructing said wharf, the sum of $236,830.59, or any other sum in excess of the sum of $140,249.21, or that it expended any sum of money whatever in excess of said last mentioned sum upon which it was understood or agreed plaintiff should have or receive five per cent thereof, as salary or commission, for superintending the work for which plaintiff was employed by defendant.''

In the second count of the answer, after alleging the passage of the resolution of June 21, 1910, and that ''*immediately following* the passage of said resolution, said Thomas Hughes took charge of the dredging of said slip, the approach thereto, and the construction of the wharf referred to in said resolution, and continued in charge thereof and directing the same up to the 8th day of October, 1912, with the consent and acquiescence of said defendant,'' alleges, that after the passage of the resolution and before October 8, 1912, defendant expended $140,249.21 and no more. Thus, according to the defendant's answer, its defense to the plaintiff's claim was merely that his work began June 21, 1910, and that only $140,249.21 was expended under his supervision. It was stipulated, however, that the cost of the work was as claimed by plaintiff, $236,830.59, and his testimony that it was all done under his supervision was uncontradicted. The trial court found as a fact that the

entire work was done under plaintiff's direction for an agreed compensation to him of five per cent.

We will, however, not determine the appeal upon these broad considerations, but enter into an examination of the specific points urged by appellant for a reversal for the purpose of ascertaining whether or not there has been a miscarriage of justice, either in the conclusion of the court or in the rejection of evidence which might have substantially changed the result.

At the outset it should be observed that the appellant's contention is simply this: That by the dealings between the parties from and after the twenty-first day of June, 1910, including the resolutions of the board of directors thereafter adopted and the statements rendered by the appellant to the plaintiff, that the parties construed the contract as beginning June 21, 1910, and as applying only to expenditures thereafter incurred. From these considerations it is urged that this construction of the agreement by the parties should control. Before discussing the evidence in detail it should be observed that the defendant does not plead payment, accord and satisfaction, estoppel or an account stated, but relies upon the fundamental proposition that by the contract between the parties as originally made the plaintiff is only entitled to recover a percentage upon expenditures incurred after June 21, 1910.

[2] In the first place, if the contract is definite and certain it is neither necessary nor proper to rely upon the conduct of the parties for its construction. Rules of construction are resorted to for the purpose of ascertaining what the contract really was and if that matter is not in doubt, it is unnecessary to rely upon those considerations which obtain where the construction of the contract is in doubt. It is not contended by either party that the resolution of June 21, 1910, was a contract. Plaintiff is not relying upon that resolution as the contract, but upon the arrangement he had entered into informally with the directors of the company. These directors knew that he was performing the work and that they had asked him to do it and had agreed with him upon the amount of his compensation. With that knowledge on his part and on theirs they passed a resolution authorizing the execution of a formal contract for the supervision of the entire work. [3] This resolution, coupled

with the previous knowledge and consent of the directors and their subsequent retention of the services of the plaintiff and the payment to him for those services, must be deemed a ratification of the previous informal arrangement between the officers of the corporation and the plaintiff. It would seem that this resolution justified, if it did not require, the finding of the trial court that all this work was done under an agreement by which the plaintiff was to receive five per cent commission.

Let us assume the truth of all the facts that the appellant relies upon to justify a different construction of the agreement, namely, that the account-books of the defendant corporation were kept upon the theory that the plaintiff was only entitled to compensation for expenditures made after June 21, 1910; that statements were rendered to the plaintiff upon that basis; that he accepted the payment accompanying such statements, and executed receipts in full from time to time based upon such statements: [4] Is there anything in this situation that requires a finding that the original intention of the parties was to confine the agreement for compensation to a percentage upon work done after June 21, 1910, where the directors had made an informal agreement long before that date and it had been acted upon by both parties before that time and the resolution of June 21, 1910, is broad enough to cover all work done before as well as after the date of its passage? We think not. It might tend to show a subsequent implied agreement to accept less than was originally agreed, but no such agreement is pleaded or relied upon.

But the circumstances relied upon by the appellant do not all tend to show such a course of dealings as is claimed by appellant, for, if we assume that the subsequent dealings between the plaintiff and the defendant point to the conclusion that the plaintiff was to receive nothing for expenditures made previous to June 21st, we are at once met by the proposition that if that is true, he has been already overpaid $522.99. This fact alone might have been sufficient in the view of the trial court to overcome the inference derived from the balance of the testimony which appellant so strongly relies upon as showing the contemporaneous construction of the contract.

[5] The appellant strongly relies upon an alleged error of the trial court in rejecting the carbon copy of a letter offered by appellant, produced from the records of the defendant corporation, dated April 28, 1911, and addressed to the plaintiff at the place of business of the Hughes Manufacturing Company. The letter is in the following words and figures: ·

"April 28th,                        1

"Mr. Thomas Hughes, 1430 So. Alameda St., Los Angeles, Calif.

"Dear Sir: We inclose you herewith schedule showing the expenditures made under your directions on behalf of this corporation during the period of June 21st, 1910, to April 28th, 1911, inclusive, on which amount ($37,946.61) 5% commission amounts to $1,897.33.

"The total amount of our indebtedness to the Hughes Mfg. & Lbr. Company aggregates the sum of $1,326.23, which amount plus your commission makes a total credit to you of $3,223.56.

"There is still a balance due on your underwriting account of $2,173.00 which amount plus accrued interest as per enclosed statement makes a total of $2,206.36 or amount due us.

"Totally liquidating the Hughes Mfg. & Lbr. Co.'s account, there shows a balance of $1,017.20, credit to your commission account. We are preparing to deliver you $4,000.00 First Mortgage 6 % Sinking Fund Gold Bonds of this corporation together with 20 shares of stock representing your underwriting.

"Yours very truly,

"Pacific Wharf & Storage Co.

"By ————, Secretary."

The witness testified that he wrote the letter under the dictation of the secretary, that to the best of his recollection it was mailed to the plaintiff at the address stated. Upon cross-examination as to this statement, preliminary to the introduction of the letter, he stated that he remembered this letter, although he did not remember any other letter written to Mr. Hughes or to anyone else that month. He was asked as follows:

"Q. And you remember that it was mailed out? A. All our letters were mailed out.

"Q. I am asking you as to your recollection, not your custom. Do you recollect at all that this letter, the original, was ever mailed out? A. I don't remember of mailing the letter, but I know it was mailed.

"The Court: How do you know it was mailed?

"A. Because all the mail was mailed out.

"Q. You are just assuming, then, that it was mailed, because all your letters were mailed after they were written? A. Yes, sir.

"Q. You don't remember whether it was mailed or not? A. I am sure it was mailed.

"Q. No, I am asking you whether you remember whether it was mailed or not—not as to drawing a deduction as to its being mailed from custom or anything, but have you any recollection of having dropped that letter in the mail-box, or in any other receptacle for mailing? A. I don't remember putting it in the box; no, sir.

"Q. (By Mr. Adams.) Then all you are testifying in regard to this letter and writing this letter and mailing this letter is from custom and from the fact that you have a carbon copy of it? A. Yes, sir. . . .

"The Court: Mr. Shonts, at that time did you mail all the letters of Pacific Wharf & Storage Company? A. Yes, sir; I put all of them in the mail myself.

"Q. All that went? A. Yes, sir.

"Q. (By Mr. Adams.) Do you mean to say that nobody else ever mailed a letter out from the office but you? A. I was the only person in there besides the secretary, and he never had anything to do with mailing the letters.

"Q. Sometimes he would mail them, would he not? A. No, sir; not to my recollection, unless it was personal letters.

"The Court: You, then, took all the mail that went from the company's office, either to a post-box or the postoffice and dropped them personally in the mail? A. Yes, sir.

"Q. (By Mr. Goodwin.) Are you positive that that letter, the original of which this is a copy, was either mailed by you to Mr. Hughes or delivered personally to him?"

This was objected to on the ground that there was no foundation laid, as incompetent, immaterial, and that "you cannot prove the mailing of a letter by merely showing the custom in the office that letters were mailed."

"The Court: It seems to me, Mr. Goodwin, that from this statement that all you will be asking for will be his knowledge from custom, and he has been answering from that right along, not drawing a distinction between his personal knowledge and what the custom was. I will overrule the objection, but I will instruct the witness that he is to answer from his own recollection. (To witness:) That means what you remember from having done specifically yourself, not from what somebody else may have told you was done, and not from any custom; not from your supposition or conclusion that it was done because of custom."

The court thereupon asked the following questions: "Have you any recollection, leaving aside the question of custom, and what you ordinarily did with reference to letters of Pacific Wharf & Storage Co., and leaving aside the question of the copy you have found among its files, have you any independent recollection or remembrance of your own that you yourself mailed that letter by dropping it into a receptacle belonging to the postoffice department? A. I cannot say that I have.

"Q. Now, have you, aside from the matters I have mentioned in the last question, an independent recollection of your own of having personally handed the letter to Mr. Hughes? A. Not that particular one.

"The Court: Now, that seems to clear it up, Mr. Goodwin. I do not see any escape. I will sustain the objection to the offer of the letter."

In the case of *Ford* v. *Cunningham,* 87 Cal. 209 [25 Pac. 403], it was held that the trial court improperly admitted a letter in evidence. The court there stated: "The witness stated that he had no personal knowledge that the communications addressed to Cunningham & Co. were mailed, except that copies thereof appeared in the plaintiffs' copy-book, and that it was a general custom of his firm to place letters in a box in the store, from which they were taken to the postoffice. No foundation, therefore, was laid for the introduction of the evidence."

The case was retried. The letter was again received in evidence upon the additional proof being made that it was the business of one of the employees to take the letters out of the box in which they had been placed and deposit them in the postoffice, and this employee called as a witness testi-

fied that if any letter was addressed and put in the box at the store during the time he was so employed, he took it to the postoffice. The court, in passing upon the matter, said: "We think this sufficient proof of the fact of mailing." (*Sanborn et al.* v. *Cunningham et al.*, 4 Cal. Unrep. 95, 100 [33 Pac. 894].) The first decision in *Ford* v. *Cunningham, supra,* was based upon the case of *Brailsford* v. *Williams,* 15 Md. 150 [74 Am. Dec. 559]. In that case the supreme court of Maryland said: "The fact was to be found by the jury from the custom prevailing in the counting-room of the writer; but compliance with the custom had not been fully proved. *The person whose duty it was to deposit letters in the postoffice should have been called, or his absence accounted for.* A similar question arose in *Bell* v. *Hagerstown Bank,* 7 Gill (Md.), 216, where the law was fully discussed." (Italics ours.)

In the case thus referred to, *Bell* v. *Hagerstown Bank,* 7 Gill (Md.), 216, proof of the mailing of the letter was held sufficient, although the bank messenger whose duty it was to mail letters had no independent recollection of the mailing of the particular letter in question, but testified that it was his invariable custom to take all the letters to the postoffice, and that he had no recollection of any failure to do so, with a single exception which had nothing to do with the letter involved. The matter is discussed at length in a very recent case by the supreme court of Wisconsin (*Federal Asbestos Co.* v. *Zimmerman,* 171 Wis. 594 [177 N. W. 881]). The court there stated:

"We know of no decided case which holds that mere dictation or writing of a letter, coupled with evidence of an office custom with reference to the mailing of letters, is sufficient to constitute proof of the mailing of such letter, in the absence of some proof or corroborating circumstance that the letter was at least placed where, in the ordinary course of business, it would be taken to the postoffice. . . .

"An examination of the reported cases, where proof of custom has been held sufficient to establish the fact of mailing, will show that there was testimony from which it might be inferred that the custom in the particular instance had in fact been followed. . . . While we do not attempt to lay down any hard-and-fast rule with reference to the proof necessary to constitute mailing where custom or usage of

an office is relied upon as a contributing element to such proof, we do hold that proof of the dictation of a letter, coupled only with proof of the custom of the office with reference to the mailing of letters, without any proof from which it may be inferred that in the particular instance the custom was complied with, does not constitute proof of mailing.''

The court in that case quoted the rule from 16 Cyc., 1068, note 50, as stating the rule as strongly as the authorities warrant: ''Proof of custom in the sender's office whereby letters deposited in a particular place are taken by an employee and mailed by him, in connection with proof that the letter was so deposited and probably taken and mailed as usual, may support a presumption of due receipt.''

This rule is also stated in 22 Corpus Juris, 99, note 14. The rule, however, as stated in the text, is as follows: ''In order to support a presumption of receipt of a letter, there must be satisfactory proof that it was duly mailed, although such proof need not consist of direct and positive testimony to the ultimate fact of mailing.'' (22 Corpus Juris, p. 99, sec. 40.)

These general conclusions are sustained by other decisions. (*McKay* v. *Myers,* 168 Mass. 312 [47 N. E. 98]; *Swampscott Machine Co.* v. *Rice,* 159 Mass. 404 [34 N. E. 520]; *Commercial Bank of Albany* v. *Strong,* 28 Vt. 316 [67 Am. Dec. 714]; *Whitaker* v. *Morrison,* 1 Fla. 25 [44 Am. Dec. 627]; *Ball* v. *Bank of Alabama,* 8 Ala. 590 [42 Am. Dec. 649]; *Sheldon* v. *Benham,* 4 Hill (N. Y.), 129 [40 Am. Dec. 271].) In *Swampscott Machine Co.* v. *Rice, supra,* the court said: ''The plaintiff's bookkeeper received it at the date of the maturity of the note, and at once put it into a box in the office, stamped, and with a direction for return if not delivered in five days. It was the regular course of business for an office boy to carry the letters from this box to the postoffice. The letter never was returned. This was evidence that the notice was sent and received. *Dana* v. *Kemble,* 19 Pick. (Mass.) 112, *Skilbeck* v. *Garbett,* 7 Q. B. 846.''

In Wigmore on Evidence, volume 1, page 169, section 95, it is said that upon proof of the custom of a business house with reference to mailing letters and upon the presumption that a letter mailed is received, the mere writing of a letter may be sufficient evidence of its receipt. The author an-

nounces his conclusion in the following language: "A consequence of the combination of these two applications of the principle is that, upon proper evidence of the habit of an individual commercial house as to addressing and mailing, the mere writing of a letter in the usual course of business may be evidence of its subsequent receipt by the addressee."

In the case at bar the witness testified that he mailed the letter in question. Upon cross-examination he admitted that his testimony was based upon his invariable custom so to do, but this does not render his evidence unworthy of belief. It only goes to the weight of the evidence. This character of testimony, based upon the custom of the witness rather than his recollection, is discussed in Moore on Facts, volume 1, page 519, section 547, in which discussion he quotes from *Evison* v. *Chicago etc. R. Co.*, 45 Minn. 370 [11 L. R. A. 434, 48 N. W. 6]: "While a witness can only testify to that which is within his personal knowledge, yet, if from his invariable and long-continued habit to perform a certain act in the line of his work, or from any other facts which aid or refresh his memory, he is able to testify of his own knowledge that he did the act on a particular occasion, the evidence is competent, although he may not have any independent recollection of the fact. If a witness is truthful, this is usually the only testimony which he can give in such cases, where there was nothing to particularly impress the particular occasion upon his mind; and it is well known that the almost unconscious and automatic action resulting from the constant and long-continued habit of doing a particular act under like circumstances in the line of any particular occupation furnishes not only strong moral proof that it was done, but also the principal assurance, in many things involving the safety of the public, that it will be done in the future."

[6] In the case at bar we are only required to determine whether or not a sufficient foundation is laid for the introduction of a carbon copy of a letter when a witness states that he mailed the letter to the addressee thereof, and bases such testimony upon his invariable habit of mailing all such letters. We think that sufficient foundation was laid for its introduction. But it was also objected that the letter was incompetent.

The letter was a self-serving declaration. There is a serious question whether this self-serving declaration could be admitted in the absence of an answer. Some of the authorities hold that the mere failure to answer a letter or other written statement does not amount to an admission or an acquiescence in the truth of the facts contained in it (1 Encyclopedia of Evidence, 378, and authorities cited therein, and in the supplement thereto). The letter was not offered to prove an account stated but in connection with a number of other letters and documentary evidence to establish the proper construction of the original contract. We may, however, concede its admissibility as this point is not pressed by respondent, and pass to the question of whether the exclusion of this letter resulted in a miscarriage of justice. In this connection it should be observed that other evidence of greater weight upon that subject and to the same effect as the letter in question was received in evidence. It was shown that the plaintiff was present at meetings of the board of directors, held on November 9 and November 15, 1910. On November 9th the following resolution was passed:

"It was moved by Director Blankenhorn, seconded by Bastable and duly passed that the secretary be and he is hereby directed to prepare a statement showing the expenditures made for account of dredging operations during the period June 21st, 1910, and November 1st, 1910, inclusive, and present the same to the board at its next meeting for the purpose of making a settlement with Director Hughes for his services in connection with said dredging operations in accordance with a certain resolution adopted at the meeting of the board of directors held June 21st, 1910."

On November 15th the following resolution was adopted:

"It was moved by Director Bastable, seconded by Director Blankenhorn and duly passed that a statement of expenditures made in connection with dredging operations from June 21, 1910, to November 1, 1910, be submitted to the auditing committee and upon said committee's verification and approval of the same, that Director Hughes be credited with five per cent commission on the amount expended in accordance with the resolution passed by the board of directors at its meeting of June 21, 1910."

This evidence, showing the transactions of the board of directors at which the plaintiff was present and in which he

participated, was much more calculated to show an acquiescence of both parties in the claim that the work began June 21, 1910, than the declaration of the secretary, a subordinate officer of the corporation, communicated to plaintiff by a letter of April 28, 1911, nearly a year after the resolution of June 21, 1910, in which he merely recites the amount of commissions earned during the period from June 21, 1910, and in which the secretary states the balance due to plaintiff and to the Hughes Manufacturing Company.

The trial court must have been convinced from the evidence that the subordinate officers of the defendant corporation treated the transaction between plaintiff and defendant as having begun on the date of the resolution of June 21, 1910; that the directors of the corporation knew of this situation and that the plaintiff also had reason to believe that the accounts were so kept. The resolutions above quoted accomplish all that could have resulted from the introduction of the letter of April 28, 1911.

The only purpose for which this letter was sought to be introduced was upon the claim that it tended to show the contemporaneous construction of the contract. When this letter was written the contract had been in effect for about a year and, according to the evidence and the letter itself, over $100,000 had been expended thereon. [7] The mere declaration by one of the parties to the contract to the other party to the effect that the actual amount due thereunder was an amount actually $3,000 less than the amount that was really due would not be binding upon the other party to the contract as a construction of the contract. Nor would the acceptance of a payment accompanying such a declaration be binding upon the plaintiff as such construction. The contract established by the plaintiff's evidence and by stipulation was for five per cent commission upon all the work done under plaintiff's supervision except the construction of the dredge. Its meaning was not in doubt. We conclude, therefore, that in view of the abundant evidence introduced by the defendant to show the character of the dealings between the parties after June 21, 1910, and the fact that the evidence of the plaintiff is uncontradicted and was evidently believed by the trial court, that upon such evidence plaintiff was justly entitled to recover the full amount claimed, and

that the rulings of the court complained of were not prejudicial, even if erroneous, a point we need not determine.

Appellant urges that the trial court committed error in sustaining objections to its evidence, offered to prove that the stipulated total of $236,810.07 included an item of $40,000 for the cost of construction of the dredge. Plaintiff conceded in the trial court that he was not entitled to commission for the construction of the dredge; and it is clear that if the cost thereof was included in the stipulated total, the judgment is for that reason too much by $2,000. The question argued here, however, is not squarely presented by the record. The ruling of which the appellant complains is not based upon a different view. The above stipulation fixed the cost of dredging before June 21, 1910, at $3,375.47 and the total amount at $59,857.75 for dredging, making the amount expended for dredging after June 21, 1910, $56,482.28. The defendant, without seeking to be relieved from these stipulations, attempted to prove that the item of $59,857.75 for dredging included $40,000, the cost of constructing the dredge. Not only was the offer inconsistent with the stipulation which gave the cost of dredging as $59,857.75, but it was also inconsistent with defendant's whole theory, which was that a large part of the work was done before the resolution of June 21, 1910, and also with the stipulation to that effect. The dredge was the first thing constructed and it could not have been included in the expenditures after June 21, 1910, unless the whole stipulation was wrong as to the date and character of expenditures. Moreover, the question now presented to us was not squarely raised in the trial court. The defendant's bookkeeper was asked: ''Q. I will ask you to examine the ledger account and state whether or not the cost of the dredge is included.'' This was objected to on the ground that it was incompetent, irrelevant, and immaterial and called for the conclusion of the witness, that there was no proper foundation and that it was at variance with the allegations of the complaint and of the answer. This objection was sustained.

It is evident from the whole record that the court was of the opinion that the ledger account itself should be offered rather than the witness' interpretation thereof and that this was the basis of the last ruling. It is clear that the evidence offered was in conflict with the stipulation and that the

defendant not having asked to be relieved from the stipulation is bound thereby and cannot now complain of the ruling of the trial court.

Appellant also contends that certain items of expenditures specified in the stipulation are not affirmatively shown to have been expended in the construction covered by the contract. The following items are pointed out: Earth filling, $40,248.65; pile-driver, $4,266.47; launch, $2,758.81; sheds, $817.21; board walk, $278.35; Launch expense, $317.66; tools, 176.70; wharf insurance, $72.50. These items aggregate $48,936.35. The questions now argued with reference to these items were not presented to the trial court. The controversy there was whether or not the plaintiff was entitled to commissions upon expenditures incurred before June 21, 1910. These expenditures amounted to $72,431.52. Appellant also contended that it was entitled to a $40,000 deduction from the expenditures incurred after June 21, 1910, being an amount which, it was contended, was expended for the construction of the dredge. These deductions would leave only $144,399.07. The deduction for respondent's engineering fees hereinafter referred to amounted to $8,741.89. This would leave a balance of only $135,658.08, while appellant conceded in its answer that plaintiff was entitled to commissions for more than this amount, to wit, upon $140,249.21. Under these circumstances we think the trial court was justified in construing the stipulation "that the defendant expended from the commencement of its work at San Pedro to October 8, 1912," the sum of $236,810.07, as a stipulation that these expenditures were made upon the work superintended by plaintiff.

The other numerous complaints of errors all relate to the exclusion of evidence showing the correspondence of the defendant with plaintiff, and, after October 8, 1912, with his agents, and statements of account accompanied by checks in payment thereof, all offered for the sole purpose of showing contemporaneous construction of the contract. We deem it unnecessary to examine in detail the numerous assignments of error for the reason that it is apparent that even if all the testimony had been introduced, it only tended to show the defendant's method of carrying the account and the failure of plaintiff to object thereto, which, in view

of the undisputed evidence, is of slight importance, if not wholly immaterial.

The appellant in its petition for rehearing for the first time raised the point that the judgment of the court allows the plaintiff a commission of five per cent upon his commission already paid, to wit, on the sum of $8,741.89. The court allowed five per cent upon the entire expenditures stipulated to and these expenditures did include under the head of engineering fees the amount of commission allowed and paid to the plaintiff, of $8,741.89. The respondent does not answer this contention, and, so far as we can see, there is no answer to be made to it. Its inclusion in the total was a palpable inadvertence which could have been avoided if the defendant had called the attention of the trial court to the point. Evidently it was not the intention of the parties to pay the plaintiff a commission upon his commission. Five per cent on $8,741.89 would be $437.09. The judgment is too great by this amount and it should be reduced. Inasmuch, however, as the appellant did not raise the question until the petition for rehearing was filed, it should not have its costs on appeal.

The trial court is ordered to modify the judgment by striking therefrom the sum of $437.09, and, as so modified, the judgment is affirmed, the respondent to have his costs on appeal.

Shaw, C. J., Lennon, J., Lawlor, J., Sloane, J., and Shurtleff, J., concurred.