[No. C000057. Third Dist. Mar. 10, 1987.]

WILLIAM H. JENKINS et al., Plaintiffs and Appellants, v.
TUNEUP MASTERS, Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

---

*See footnote 1, *post,* page 4.

**COUNSEL**

Charles W. Trainor, Stuart L. Smits and Trainor, Robertson & Smits for Plaintiffs and Appellants.

Paul, Hastings, Janofsky & Walker and John J. McCauley for Defendant and Respondent.

## OPINION

**BLEASE, Acting P. J.**—William Jenkins and Nathalie Munk (landlords) appeal from an unfavorable judgment in an unlawful detainer action. The trial court gave judgment for the tenant, Tuneup Masters, on the ground that it had exercised an option to extend the lease. The notice of extension was lost in the mail. The landlords contend that the court erred because the notice was not mailed in the manner required by the lease and because there is insufficient evidence to support a finding that the notice was mailed at all. We disagree and will affirm the judgment.

In the published portion of this opinion we hold, among other things, that the risk of loss of a notice of extension of a lease, required under its provisions to be "sent by [] certified United States Mail, return receipt requested," is upon the addressee once the notice reaches the custody of the United States Postal Service, notwithstanding that the notice is not deposited in an officially designated receptacle.[1]

### FACTS

Tuneup Masters commenced its tenancy at 2820 P Street, Sacramento, under a written lease on January 15, 1979. The leasehold term expired five years from the first day of the calendar month following the date of commencement. The lease provides that the tenant has an option to extend the lease for an additional five years. To do so the tenant must give notice of its exercise of the option six months before the expiration of the lease, as follows: "36. SERVICE OF NOTICE: Notices hereunder shall be in writing signed by the party serving the same and shall be sent by registered or certified United States Mail, return receipt requested, postage prepaid and, [shall be addressed to the other party as provided]. Any notice so mailed shall be deemed to have been given as of the time said notice is deposited in the United States Mail."

At the outset of trial the parties acquiesced in the following theory of trial. "THE COURT: I think it would follow from prior discussions with the court that the sole and narrow issue before the court is whether or not prior to August 1, 1983, a notice of renewal was deposited in the United States Mail by the defendant by certified or registered mail, return receipt requested, and if I find by a preponderance of the evidence—[¶] I'll put it this way: If I find by a preponderance of the evidence that it was, I find for the defense. [¶] In the absence of such a finding, I find for the plaintiff."

---

[1]The Reporter of Decisions is directed to publish all of this opinion except for part III.

The principal evidence bearing on this issue was adduced from Larry Selditz, vice-president of Tuneup Masters. Selditz was responsible for exercising lease extension options. He testified about the manner of preparation and sending of the option. Selditz receives a computer report informing him of the date when the option must be exercised. He then prepares a letter exercising the option for transmittal to the landlord. Selditz dictates the letter; his secretary types it, appends the certified mail number, prepares the envelope, and affixes the certified mail sticker and the return receipt. In the normal course of business the correspondence is delivered to Selditz, prepared for mailing, so that he can be satisfied that the return receipt is affixed. He signs the correspondence and returns it to his secretary. No copies are made until Selditz signs the original. Selditz's secretary seals the envelope before it is mailed.

When an envelope has been sealed it is taken to the Office Services Group (O.S.G.) in another section of the corporate office. O.S.G. makes routine mail pickups within the office and sometimes Selditz's secretary drops outgoing mail off at the O.S.G. O.S.G. affixes the correct postage.

Selditz was asked to relate the usual practice of the office with respect to depositing mail. The plaintiff landlords objected on the ground that he was not competent to testify concerning such practices. In response, Selditz testified that the office is small and everyone observes what everyone else does. He had seen the procedure for mailing numerous times. There is a post office annex on the ground floor of the building, in the parking structure. Postal personnel occupy the annex only between the hours of 9 and 10 a.m. At the end of the day when Selditz goes to his car he has often seen O.S.G. personnel carrying mail to the post office annex. Office hours are 8 a.m. to 5 p.m.; at 5 p.m. O.S.G. takes the mail to the annex. There is outgoing mail every night. The bagged mail is left outside the annex with the mail of other tenants in the building. A small postal truck arrives everyday between 5 and 5:15 p.m. and picks up outgoing mail.

Selditz testified it is his invariable practice to have letters dated on the date they are sent. When Selditz sends a letter he maintains a copy in his chronological correspondence file. A copy of the notice of exercise of option to extend this lease was present in the appropriate chronological order. Selditz also sends a copy of lease extension letters to the chief executive officer, Mr. Granatelli. A copy of the lease extension letter, dated July 29, 1983, was located in Mr. Granatelli's correspondence file. Based upon his practice and the copy in Granatelli's file Selditz testified he sent the copy to Granatelli on July 29, 1983.

Selditz's present secretary was hired on or about July 7, 1983. In July and August of 1983 the Tuneup Masters office was in the process of moving

between floors in their office building. A search of Tuneup Masters's office did not uncover the original of the notice of exercise of option to extend this lease. There was no evidence that other mail, outgoing on July 29, 1983, had been lost.

Selditz has no specific recollection of the correspondence in this case. He exercised perhaps 75 such options in 1983. Tuneup Masters has invested a significant amount of money in equipment installation at this leasehold. It always exercises options to extend leases. This leasehold is a highly profitable one.

To send a letter by certified mail in July 1983 Tuneup Masters used Postal Service Form 3800. Part of the form is affixed to the envelope and part may be detached to provide a record for the mailing party. In July 1983 Tuneup Masters did not retain the record portion of the form. Selditz saw no reason to do so since the certified mail number was kept on the file copy of the correspondence. In July 1983 Tuneup Masters had no system for logging or filing the return receipt cards that are returned in the mail after delivery of certified mail.

Prior to February 1, 1984, the landlords received no notice from Tuneup Masters that it intended to extend this lease. When matter is sent by certified mail and the deposit is not at a post office, there is no record established at the post office of origin. Approximately 70 percent of certified mail sent by businesses is mailed in this fashion. Certified mail is handled the same as first class mail until it arrives at the post office of destination. A postal employee testified that he searched the records of the certified mail delivered by the landlords' post office and that there is no record of certified mail addressed to the landlords bearing the certified mail number on Tuneup Masters's copies of the lease option extension notice.

DISCUSSION

I

The landlords contend that the trial court erred in finding that notice of extension of the lease was given by Tuneup Masters as required by the lease. They first claim that the mailing procedure followed by Tuneup Masters does not comply with postal service requirements, which they view as an intrinsic part of the notice procedures.

The threshold question is—what is the meaning of the lease provisions prescribing the manner for exercise of the option? (See generally, Annot., Sufficiency as to method of giving oral or written notice exercising option

to renew or extend lease (1984) 29 A.L.R.4th 903.) The lease provides that written notice must "be sent by registered or certified United States Mail" and that any notice "so mailed shall be deemed to have been given as of the time said notice is deposited in the United States Mail." The landlords invoke the rule that the exercise of an option to extend a lease must strictly follow the provisions of the lease prescribing the manner in which the option is to be exercised. (See *Palo Alto Town & Country Village, Inc.* v. *BBTC Company* (1974) 11 Cal.3d 494, 498 [113 Cal.Rptr. 705, 521 P.2d 1097].) They implicitly derive from this rule that the lease provision for giving notice should be strictly construed against Tuneup Masters. However, as we next show, this argument confuses rigor in compliance with a rule with narrowness in its construction.

An option is a contract establishing an irrevocable offer. As with other offers, the offeror may prescribe the mode of acceptance. (See *Palo Alto Town & Country Village, Inc., supra,* 11 Cal.3d at p. 499; Civ. Code, § 1582.) Where the mode of acceptance is prescribed it must be strictly followed. However, the a priori question is whether and how the mode of acceptance is prescribed. That is a question of interpretation of the contract provisions.

The argument, as posed, is between two disparate readings, i.e., applications, of the notice clause. We agree that there is a material uncertainty concerning the application of the contract language to the facts found by the trial court. This requires that we look to the law which guides us in the resolution of contractual ambiguity. (See *California State Auto Assn. Inter-Ins. Bureau* v. *Superior Court* (1986) 177 Cal.App.3d 855, 859 [223 Cal.Rptr. 246].)

In construing the notice provisions we are guided by the rules set forth in Civil Code sections 1635-1662; inter alia, we must select a reading that makes the contract reasonable and which employs the words of the contract in their ordinary and popular sense, unless used by the parties in a technical sense. (Civ. Code, §§ 1643, 1644.) The landlords point to Civil Code section 1654 which says that, if the other canons of interpretation do not resolve uncertainty, the language of the contract should be read against the party causing uncertainty. They note that Tuneup Masters supplied the lease form. Section 1654 does not aid the landlords. The notice provision applies to all notices under the lease, those of landlord and tenant alike, and not just to a notice of exercise of an option. Accordingly, the meaning cannot be read against either party for the reason that the meaning cannot change dependent upon the interests served in a particular controversy. Hence a univocal reading against the drafter is unavailable.

 The purpose of the notice provision appears threefold. The first is to fix the time of notice, when given by mail. The second is to provide a means of documentation of the fact of receipt, and, a fortiori, mailing. The third is to assign the risk of loss of the notice in its transmission to the addressee. Only this lattermost purpose is at issue here.[2] Thus, our task, in interpreting the requirement that notice be "sent by . . . certified mail" is to answer the question—who bears the risk of loss of the notice? Or, put another way,—when is the mailing commenced for purposes of the assignment of that risk to the addressee?[3]

Under the notice provisions of the contract, as at common law in California (*Palo Alto Town & Country Village Inc., supra,* 11 Cal.3d at pp. 500-505), the risk of loss of the notice, once it has been properly "sent" by mail is upon the landlords. The allocation of risk is premised in part upon an assessment of the reliability of the postal service as a messenger. That reliability, in turn, is premised upon the sender putting the notice into the custody of the postal service; that is to say, in a manner such that the postal service will accept custody, i.e., treat it as mail for delivery in the ordinary, reliable course of its business. Insofar as noncompliance with postal regulations has a bearing upon the reliability of delivery, noncompliance may give rise to a claim the contractual duty was breached.

 The landlords suggest that, since the postal service governs the conditions of mailing, "sent by certified mail" means deposit with the postal service in strict compliance with its regulations for certified mail. However, the contract does not say that. Nonetheless, the regulations are relevant to the interpretive task, for, if the result of noncompliance with the regulations is that the postal service will not treat an item as "sent by certified mail," the contractual expectations of the party due the notice will be entirely defeated. Hence, it is reasonable to interpret the term "sent by certified mail" as requiring the sender to comply with all aspects of postal regulations essential to its acceptance and transmittal as certified mail. Making anything more than that of the regulations would serve neither the purposes of the regulations nor the purposes of the contracting parties. For example, if the postal

---

[2]In view of the theory of trial, as announced by the trial court and acquiesced in by the parties, we have no occasion to consider whether Tuneup Masters's failure to maintain return receipts was a breach of an implicit duty warranting any relief.

[3]The answer to that question may be different than the answer to the question—At what point in the process of mailing does the time run for the purpose of the period of limitations? Whether there is a distinction turns on the language of the provision at issue. Here, there is a *facial* distinction between the two because they are contained in separate sentences. The point of the "deposit" in the mail, upon which the timeliness of the notice turns, is not *as such* the measure of the risk of loss. That turns on whether the certified mail was "sent." However, as we show, deposit does play a role in the resolution of the claims regarding risk of loss.

service regulations direct that postage be affixed right side up but no official or practical sanction attends such a defect, the item is nonetheless "sent by certified mail," if it is otherwise accepted for delivery.

 The procedures for sending certified mail are set out in the United States Post Office Domestic Mail Manual. Section 111.3 of chapter 1 provides that "the burden rests with the mailer to assure that he has complied with the prescribed laws and regulations governing domestic mail." This burden is material to the issue of risk of loss tendered here because it places the responsibility upon the sender to get the mail properly into the hands of the post office. Provisions for doing such have been made in section 912.43 of chapter 9 of the manual. It says: ".43 Where to mail. Customers *may* mail certified mail at the post office, branch, or station or give it to a rural carrier. It *may* also be deposited in mail drops in post offices, street letter boxes, nonpersonnel units, or any other receptacles for First Class mail, provided the specific directions in 912.44 are followed." (Italics added.) Section 912.44 sets forth the manner in which the certified mail must be prepared so that it will be recognized as such by the post office. Only one claim is made by the landlords based upon this regulation, a matter to which we will shortly turn.

The point of interest here is that section 912.43 sets forth places and persons where certified mail *may* be placed, implying that, when such is done, the postal authorities will assume responsibility for its delivery. But, by use of the term "may," its provisions are not exclusive. Section 912.43 does not rule out additional methods of mail collection to be determined by the practices of local postal authorities. Moreover, the section makes no distinction between certified and first class mail. Whatever special handling is accorded certified mail, over and above that given first class mail, is provided *after* the mail reaches the postal authorities. Thus, the dispositive question here is whether the local postal authorities will assume responsibility for delivery of mail contained in a mail sack when, as here, the sack reaches the custody of a postal employee when he picks it up from the area adjacent to a post office annex.

Section 912.43 does not specifically provide for that eventuality. The giving (handing) of a certified letter to a rural mail carrier satisfies the first sentence of the provision. The second sentence appears to be directed to places under the jurisdiction of the post office. It does, however, use the term "deposited." That term is quite elastic. (See, e.g., *Walster* v. *United States* (N.D.N.Y. 1890) 42 Fed. 891, 895 ["deposited" refers to mail-matter left in any way "for official transmission with an employe in the course of his employment"]; *United States* v. *Wilson* (11th Cir. 1982) 671 F.2d 1291, 1293 [inmate handing mail to jailer for mailing is a deposit.]) Where there is no

showing that mail has been placed in an authorized receptacle controlled by the post office and no showing that it has in fact otherwise reached the custody of the postal service the mail has not been "sent." (See Annot., Character and sufficiency of evidence to show that letter was mailed (1923) 25 A.L.R. 9, and the supplementary Annot. of the same title (1933) 86 A.L.R. 541.) However, given the latitude for local practice implied by the permissive "may," and the recognition, for rural mail, that custody will be assumed when mail is handed the mail carrier, we conclude that the purpose of the postal regulation has been complied with when the certified letter actually reaches the custody of the postal authorities in a manner recognized by them by local practice.

The purpose of section 912.43 is to identify points at which the post office assumes responsibility for the mail. The places and persons listed satisfy that requirement. But there is no evidence in this record which indicates that this list is treated by local postal authorities as exclusive. The evidence of the local practice under which Tuneup Masters conducted its business is to the contrary. We therefore conclude that, on the record before us, when there is actual receipt of an item of certified mail by the mail carrier, who customarily picks up sacks outside a post office annex, the item has been "sent by certified mail."

We imply no view on the question of the risk of the loss of mail from a *place,* not set forth in section 912.43, where it is customarily accepted by employees of the postal service. It is unnecessary to consider that question because here the trial court explicitly inferred that the *mailbag* and hence the letter containing the notice of exercise of the option did reach the custody of the postal service despite the claimed irregularity in its place of deposit. The fact that no other mail placed in the mailbag and left outside the annex on July 29, 1983, was lost affords an inference that the mailbag was picked up by the postal service. The trial court reasoned that the prospect that a miscreant would filch one letter from the mailbag in the vulnerable interval was remote. There is no lack of substance in the evidence supporting the inference.

█ The remaining claim of noncompliance with postal regulations is the failure to fill out Tuneup Masters's receipt portion of the certified mail document. As to this claim, the apparent purpose of section 912.44 is to afford the sender a record of the mailing for purposes of instituting a search if the mail is lost.[4] A postal employee testified that recording the address of the

---

[4]Section 912.44 permits the sender of certified mail to fill out and attach to the item of mail a receipt for certified mail. It says: "How to Mail. Obtaining blank certified mail coupons, Forms 3800, Receipt for Certified Mail, (no charge) at the post office or from rural mail

mailing and the certified mail identification number is equally sufficient to satisfy that purpose. There is no indication in the notice provision of a material, reasonable interest of the recipient of a notice in insisting upon recordation of the information on the postal service form as opposed to the copy of the correspondence. Hence, under the California law, we see no reason to construe the lease provisions to require strict adherence to postal regulations on this point.

## II

■ The landlords also challenge the sufficiency of Selditz's testimony to sustain the finding that the notice was properly mailed. This argument relies upon two opinions of the California Supreme Court, *Ford* v. *Cunningham* (1890) 87 Cal. 209 [25 P. 403] and *Hughes* v. *Pacific Wharf etc. Co.* (1922) 188 Cal. 210 [205 P. 105]. The landlords derive from these precedents a rule that evidence of mailing based upon habit and custom must be supported by testimony from all of the employees in the chain of custody coupled with proof of compliance with that custom on the occasion in question. As we next show, if such a common law rule ever existed it has been extinguished by the enactment of the Evidence Code.

*Ford* v. *Cunningham, supra,* 87 Cal. 209 is a sparse and cryptic opinion. The pertinent passage says: "Mr. Morey, one of the plaintiffs, was permitted by the court to state the contents of certain bills and letters which he claimed had been addressed and sent to Cunningham & Co. Objection was made by

---

carriers. Also obtain blank return receipt forms if needed. Observe the following procedure: a. Enter on the receipt portion of the certified mail coupon the name and complete address of the person or firm to whom the mail is addressed. b. If a return receipt is desired, check the block on the mailing receipt to show the fee and endorse the article on the address side near the certified mail endorsement Return Receipt Requested or Return Receipt Requested Showing Address Where Delivered. The mailer must enter the certified mail number on the return receipt card, address it to himself, attach it to the back of small envelopes and on the front of packages and large envelopes if it will not cover the address. The name of the person to whom the return receipt is to be furnished must be the same as that of the sender as shown on the certified article. If the mailer desires that the return receipt show the address where the article was delivered, he must check the block at the top of the form. c. Attach to the envelope sufficient postage stamps to pay for the certified mail fee, First-Class postage, return receipt fee, or special delivery fee, as appropriate. d. If a postmarked sender's receipt is desired, the sender must attach the certified mail sticker to the address side of the article and present the article and the completed coupon to the postal employee. If asked to do so, the postal employee will show on the receipt the time the article was accepted for mailing. If given to a rural carrier, he will return the postmarked receipt to the customer. e. If a postmarked receipt is not desired, the sender must attach the certified mail sticker to the address side of the article, detach his receipt, and mail the article. He must mark his receipt to show the date. f. If the sender desires to restrict delivery of certified mail to the addressee or someone named by him in writing, he must endorse the mail Restricted Delivery. This service is available only for articles addressed to specific individuals by name."

the defendants to the introduction of oral testimony as to the contents of the bills and letters, and the objection was overruled. We think the court erred in its ruling. The witness stated that he had no personal knowledge that the communications addressed to Cunningham & Co. were mailed, except that copies thereof appeared in the plaintiffs' copy-book, and that it was a general custom of his firm to place letters in a box in the store, from which they were taken to the post-office. No foundation, therefore, was laid for the introduction of the evidence." (87 Cal. at p. 210.)

There is no indication of the reasoning which underpins this holding. Hence, on its face, all that the case stands for is that the bare assertion of a general custom concerning mailing practice does not suffice to establish mailing where there is a foundation objection. This could be based on some lack of competency of the witness or upon a perceived lack of particularity and clarity of the testimony of custom and habit. (See *Leasing Associates, Inc.* v. *Slaughter & Son, Inc.* (8th Cir. 1971) 450 F.2d 174, 180.) We also know, from the record revealed in a subsequent opinion in the same case, that the employee, charged with the duty to carry letters from the office box to the post office, did so every night during the period in question and that this was viewed as sufficient to establish mailing. (*Sanborn* v. *Cunningham* (1893) 4 Cal.Unrep. 95, 100 [33 P. 894].) Again, however, this a bare conclusion, the reasoning concealed in the conclusionary assertion: "We think this sufficient proof of the fact of mailing." (*Ibid.*) The landlords urge that we divine in the ellipsis between the facts and result in *Ford* v. *Cunningham* the rule concerning evidence of mailing that they proffer. As appears, we decline to do so.

*Hughes* v. *Pacific Wharf etc. Co., supra,* 188 Cal. 210 is a more elaborate opinion. Read carefully, it affords no support for the landlords' argument. The holding in *Hughes* is that mailing is sufficiently shown "when a witness states that he mailed the letter to the addressee thereof, and bases such testimony upon his invariable habit of mailing all such letters." (*Id.,* at p. 224.) Prior to this conclusion, the *Hughes* opinion recounts the *Ford* v. *Cunningham* opinion along with extracts from various out-of-state cases and secondary authorities concerning the sufficiency of the evidence to show mailing. (*Id.,* at pp. 221-224.) *Hughes* includes a citation of authorities on all sides of that issue. In this case the landlords seize upon the case law favorable to the rule they espouse as approved in *Hughes*. However, the even-handed annotation provides no support for the conclusion that *Hughes*, even in dictum, is authority for that rule.

One of the authorities contradicting the landlords' proffered rule that is cited in *Hughes* is Wigmore on Evidence. (*Hughes, supra,* 188 Cal. at pp. 223-224.) Wigmore suggests that there is a connection between the older

holdings that habit evidence of mailing requires corroboration and/or that the employee[s] in the chain of custody of the mail must be called as witnesses and older common law rules regarding proof of business records. (See 1A Wigmore, Evidence (Tillers rev. ed. 1983) § 95, especially fn. 3, pp. 1640-1641.) For example, at common law it was often the rule that habit evidence was inadmissible unless there were no eyewitnesses to the fact sought to be proved. (See *id.,* §§ 93, 98; *Boone* v. *Bank of America N.T.&S. Assn.* (1934) 220 Cal. 93, 95-96 [29 P.2d 409].) Hence, failure to call the mail clerk as a witness to the question of habit could bar establishing mailing by other witnesses because it would have to be established that the mail clerk had no present recollection of the actual mailing in question. Wigmore suggests that the demise of these older common law rules, concerning proof of business records, has eviscerated the rule that habit testimony of mailing must come from the employee whose habit is relied upon. (See 1A Wigmore, Evidence, *supra,* § 95, fn. 3, pp. 1640-1641.)

In California, the law of evidence has been recodified in our present Evidence Code. Evidence Code section 351 says: "Except as otherwise provided by statute, all relevant evidence is admissible." This provision casts generic doubt on preexisting common law rules which rule out evidence on grounds other than relevancy, e.g., upon *Ford* v. *Cunningham.* That precedent is further undercut by Evidence Code section 1105 which says "[a]ny otherwise admissible evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom." The Law Revision Commission comment to section 1105 reveals that it is meant to overturn *Boone* v. *Bank of America, supra,* 220 Cal. 93. In similar fashion, many analogous common law restrictions on the admissibility of business records have been swept away in statutory reform of the law of evidence. (Cf. *Loper* v. *Morrison* (1944) 23 Cal.2d 600, 607-610 [145 P.2d 1].) These developments have rendered restrictive precedents of dubious value. (See *Thompson* v. *Machado* (1947) 78 Cal.App.2d 870, 872 [178 P.2d 838].) If *Ford* v. *Cunningham* was at any point authority supporting the landlords' argument in this case, its authority has been eclipsed by statute. On its merits, the landlords' argument is unpersuasive because it is not in keeping with statutory developments in the law of evidence.

Here Selditz's testimony concerning the habit and custom of Tuneup Masters is detailed. The only objection to his competency concerned the transportation of mail by the Office Services Group to the premises outside of the postal service annex. The landlords do not assert on appeal that the trial court erred in its finding that the testimony was competent based upon the proffered foundation of Selditz's personal observation of that practice. If the landlords wished to examine other employees in the chain of custody of the mail they were at liberty to do so. On this record, Selditz's direct

evidence of Tuneup Masters's custom and habit concerning mailing practices is sufficient to prove the fact of those mailing practices (See Evid. Code, § 411.) A reasonable trier of fact could find that the evidence satisfied Tuneup Masters's burden of proof to show it had deposited notice of extension of the lease in the United States mail, as certified mail, return receipt requested. For all the foregoing reasons we find no merit in the landlords' contrary contention.

### III*

. . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed.

Sparks, J., and Smith (S. B.), J.,† concurred.

A petition for a rehearing was denied April 8, 1987, and appellants' petition for review by the Supreme Court was denied June 17, 1987.

---

*See footnote 1, *ante,* page 4.
†Assigned by the Chairperson of the Judicial Council.