[Civ. Nos. 1993 and 2017. Second Appellate District.—October 2, 1916.]

MAY CATLIN, Administratrix of the Estate of John Catlin, Deceased, Respondent, v. UNION OIL COMPANY OF CALIFORNIA (a Corporation), Appellant; WILLIAM M. RILEY et al., Respondents.

NEGLIGENCE—EXPLOSION OF GASOLINE—SALE FOR KEROSENE—PROXIMATE CAUSE.—In an action for damages against an oil company and a grocer for the death of a patron of the latter from an explosion of gasoline sold to the deceased by the grocer for kerosene, where it is shown that the oil company in filling an order of the grocer for kerosene had mistakenly made a delivery of kerosene and gasoline mixed, and that the grocer upon discovering such mistake, notified the company thereof and the latter agreed to

take the oil back, but before the oil was taken back the grocer relying upon his experience in dealing in such oils, and upon a personal test made by him, sold the oil which caused the explosion, the direct and proximate cause of the damage was the intervening act of the grocer, and not the negligence of the oil company.

ID.—PROXIMATE CAUSE—WHAT CONSTITUTES.—Proximate cause is that cause arising out of a breach of duty which in a natural and continuous sequence produces the damage complained of.

ID.—INTERVENING ACT OF NEGLIGENCE—LIABILITY OF ORIGINAL WRONG-DOER.—If the negligent acts of two or more persons, all being culpable and responsible in law for their acts, do not concur in point of time, and the negligence of one only exposes the injured person to risk of injury in case the other should also be negligent, the liability of the person first in fault will depend upon the question whether the negligent act of the other was one which a man of ordinary experience and sagacity, acquainted with all the circumstances, could reasonably anticipate or not. If such a person could have anticipated that the intervening act of negligence might, in natural and ordinary sequence, follow the original act of negligence, the person first in fault is not released from liability by reason of the intervening negligence of the other. If it could not have been thus anticipated, then the intervening negligent person alone is responsible.

ID.—NEGLIGENCE—WHEN QUESTION OF LAW.—While it is true that questions involving alleged negligent action which turn upon the proposition as to what should be expected of an ordinarily reasonable man under the circumstances, present mixed questions of law and fact which generally should go to the jury under proper instructions as to the law, leaving the deductions of fact to be made by the verdict, yet, on the other hand, where the facts are undisputed and clearly settled, and the dictates of common prudence point to only one reasonable conclusion, the question is then one of law for the court, and a verdict may be either directed or a nonsuit granted.

ID.—EVIDENCE—CHARACTER OF FLUID—STATEMENTS OF DECEASED—INCOMPETENT TESTIMONY.—Statements made by the deceased immediately after the explosion to the effect that the fluid used was gasoline are inadmissible, being self-serving and expressive of the opinion and conclusion of the witness.

ID.—MANNER OF FILLING LAMP—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.—The question whether the deceased was guilty of contributory negligence at the time of the explosion by reason of the fact that he was engaged in filling an oil-lamp with the fluid, while he had a lighted miner's lamp on his cap, is one for the jury, where there was expert testimony that a lamp could be thus filled with reasonable safety, and without great danger, provided the fluid was coal-oil of ordinary quality.

APPEAL from a judgment of the Superior Court of Los Angeles County, and from an order denying a new trial. Willis I. Morrison, Judge.

The facts are stated in the opinion of the court.

Lewis W. Andrews, A. V. Andrews, Thos. O. Toland, Andrews, Toland and Andrews, W. H. Bowers and Cedric E. Johnson, for Appellant.

R. T. Lightfoot, Walter Whitworth, J. W. Whitworth, and E. B. Drake, for Plaintiff and Respondent.

A. G. Alm, for Respondents, William M. Riley et al.

JAMES, J.—This action was brought to recover damages for the death of John Catlin, alleged to have been caused by the negligent acts of the defendant Union Oil Company and William M. Riley. Mary E. Riley, the wife of William M. Riley, was also sued, but the action was dismissed as to her in the course of the trial. The jury returned a verdict in favor of the plaintiff and against the defendant Union Oil Company for the sum of seventeen thousand dollars, on which judgment was entered. By the verdict it was found that William M. Riley was not liable for damages in any sum. The defendant Union Oil Company appealed from the judgment, and from an order denying its motion for a new trial.

In November, 1912, William M. Riley was conducting a grocery store at the town of Sawtelle in Los Angeles County. Among other classes of merchandise he dealt regularly in fuel oils, including gasoline and kerosene. The oils he stored in a little outbuilding some thirty feet or more away from the store proper. In this outbuilding he had a tank for gasoline and one for coal-oil or kerosene. On about the 15th of November, that being Friday of the week, he gave an order to the Union Oil Company to deliver to him sixty gallons of kerosene. The tank-wagon belonging to the oil company made delivery. The kerosene tank had a capacity of sixty gallons. The tank was not empty, but contained twenty gallons of the fluid before the quantity delivered that day was added to it. Hence, the driver of the oil-wagon was only able to put into the tank forty gallons of the sixty gallons

ordered. There were four or five empty five-gallon cans inside of the oil-room, and into these cans was poured the remaining twenty gallons, which completely filled both the tank and the other receptacles mentioned. Almost immediately after the tank-wagon had left his place, Riley, according to his testimony, took one of the five-gallon cans which had been filled as described, and delivered it to a customer; for another customer, either that evening or the following morning, he drew a gallon from the tank which had been filled; and for a third customer he made delivery of another gallon, evidently from the same supply. Complaint was very soon made by the patron who had received the five-gallon can that there was something the matter with the oil, and complaint also came from one of the persons who had received a single gallon. On Saturday morning, being the next day after the delivery of the oil, Riley got back all of the oil about which complaint had been made that he was able to secure, including the five-gallon can which he had delivered to the first customer. He testified that one of the single gallons of oil returned he poured back into the large tank; that he then had the four five-gallon cans of oil which had been filled by the tank-wagon, and of the contents of these he proceeded to make tests. Riley had for a number of years, both in the east and in California, had experience in the handling of both kerosene and gasoline as a dealer. He testified that in making his tests he dipped splinters of wood into the cans, noted the smell of the fluid, and also the rapidity with which it evaporated from the sticks; that by this means, and also by noting the odor of the fluid, he made up his mind that two of the five-gallon cans contained gasoline and two contained coal-oil; that he made a further test of the fluid in the two cans which he had concluded was gasoline by taking a small quantity thereof and placing it upon a stove where, when it was subjected to heat, it flashed up quickly. He made no further tests of the contents of the other two cans, being satisfied that these cans contained coal-oil. On cross-examination he testified that had the oil been mixed he did not know whether he would have been able to determine from the tests he made if it was gasoline or kerosene. He testified further that he took the two cans which he had determined contained gasoline, labeled them with a label showing their true contents, and placed

them up on the large gasoline tank. Then, as he testified, he delivered one of the five-gallon cans believed to be coal-oil to the patron by whom the five gallons of gasoline had been returned; that there then remained on the floor of the oil-room one five-gallon can of coal-oil which had been a part of the delivery received on the preceding day; that the same evening (Saturday) at about dark or dusk, one of the children of Catlin came and wanted kerosene oil; that he (Riley) informed the child that because of insurance regulations he could not handle illuminating oil after dark, and that as the child insisted that the family had no oil, he told her if she would bring a small can the following morning (Sunday), as he made no deliveries on that day, he would give her sufficient to last until Monday, when he would deliver the remainder of the five gallons; that on Sunday morning one of the Catlin children returned with a gallon can which he (Riley) filled from the five-gallon can sitting on the floor of the oil-room, and that the next morning he delivered the four gallons remaining in the can at the Catlin home, where he poured the oil into an empty can customarily used for that purpose. John Catlin, the deceased, at the time of his death was forty-four years of age, in good health, weighing about one hundred and eighty-five pounds. As his wife testified, he was a "strong" man, and had had no illness or needed the attention of a physician. He had been married to the plaintiff, his wife, for twenty-three years, and there survived him besides the widow, four children aged respectively: Bessie, nineteen; Pauline, seventeen; Howard, thirteen; Fred, eleven. He had been a miner, but at the date of the accident his regular employment was that of a carpenter's helper, at which work he earned $2.75 per day. His life expectancy was 25 years. On Tuesday evening following the receipt of the oil delivered by Riley, being at work laying some cement in his cellar, Catlin had occasion to make use of an oil-lamp. He was already carrying in a miner's cap on his head a small lamp such as miners customarily use. This small lamp was lighted and remained so until after the explosion which produced the injuries from which Catlin later died. Catlin went to the rear of the house in or about a screen porch in order to fill the larger oil-lamp which he intended to use, and apparently started to pour what he assumed was coal-oil or kerosene from the large can into the

lamp, when the explosion occurred. Mrs. Catlin, as she testified, heard the noise of an explosion, and almost immediately her husband ran to the front of the house, covered with fire, and rolled in the grass, calling for help. She tried to smother the flames with bedclothing and, with the help of a neighbor, the fire was finally extinguished. One witness, a Mr. Tucker, who assisted in extinguishing the fire burning on the person of Catlin, testified that when he reached Catlin the latter said: "Oh, Mr. Tucker, put this fire out on me; I am burning up. Do something for me quick—I was filling the lamp and it exploded, and before I could throw the can it exploded also—put the fire out; I am burning up—I have handled gasoline and coal-oil all my life; I am an old miner. Why should anything of this kind happen to me? I am sure that it was gasoline." On cross-examination this witness added that while on the way to the hospital the injured man had said that he had filled lamps before "when they were lit," and had never had one act that way. Catlin in his injured condition was removed immediately to a hospital, where he died two days later. It appeared without dispute that the driver of the appellant company, instead of delivering sixty gallons of coal-oil as directed, delivered in part coal-oil and in part gasoline, and that the mistake came about in this way: The tank-wagon from which deliveries were made, was divided into three compartments, one in front, one in the middle, and one at the rear. These compartments were entirely separated one from the other, and connected with each at the rear of the wagon was a stopcock or faucet; that customarily gasoline was carried in the forward tank and kerosene in the two rear ones; that on the day when the delivery to Riley was made the driver started to load his wagon and had commenced to fill the forward tank with gasoline; that desiring to attend to his team, he asked one of the other employees, an agent of appellant, to complete the filling of the forward tank, and to put kerosene into the two rear ones. These latter he knew to be empty at the time; that this employee after completing the filling of the forward tank with gasoline, filled the middle one with kerosene as directed, but through some error of understanding or judgment, put gasoline into the rear compartment. The driver testified that in delivering oil in quantities as large as that ordered by Riley, he customarily used two five-

gallon measures having handles on them, and drew from two
faucets at the same time; that he followed this custom in
making the delivery to Riley, and drew from the faucets
connecting with the two rear compartments, filling his two
measures thus at the same time, emptying them and refilling
them until the desired quantity had been secured. Riley,
the grocer, testified that he was familiar with this practice,
and noted that the driver followed it on the Friday when
he made delivery of the oil. The driver explained that in
consequence of this practice of drawing two measures at
a time, and as each measure when filled would completely
fill a five-gallon can, the four cans filled with the last twenty
gallons of oil desired by Riley, should have contained un-
mixed fluid; that is, two should have contained gasoline and
two kerosene. This conclusion would be in accordance with
the tests made by Riley. There is some discrepancy be-
tween the testimony of Riley and the testimony of the driver
of the wagon, wherein the driver stated that when he re-
turned on Monday, to take away the oil, he found one five-
gallon can full of coal-oil still standing near the door of the
oil-house. Riley had testified that he had placed two of the
five-gallon cans on top of the gasoline tank and marked them
with the word "gasoline," and that of the two remaining
which he had determined to be kerosene, he had delivered
one to the first patron who had returned the gasoline, and
had taken the other to fill the Catlin order. Riley testified
that there was in another portion of the oil-room at that time,
perhaps five gallons of coal-oil which he had received at a
prior date, and which was not included in the Friday de-
livery of mixed oil. Fred Catlin, the eleven-year old son
of the deceased, who had obtained the gallon of oil from
Riley on Sunday morning, testified that when he called for
the oil Riley first went to the fifty-gallon tank and said:
"I think this is mixed"; that Riley then went to a five-
gallon can and drew therefrom the gallon of oil and handed
it to him, saying: "I guess this is coal-oil." The lamps
used by the Catlins were ordinary glass lamps with no aper-
ture separate from the wick-holder through which oil might
be introduced into the bowl. To complete the narrative of
facts it is necessary to refer to an occurrence which took
place on Saturday, before any of the oil tested by Riley was
resold. When the first oil put out by Riley on Friday and

Saturday morning had come back to him with the report that
something was wrong with it, he made his tests of the oil in
the five-gallon cans as has been hereinbefore described. He
then phoned to the branch office of the Union Oil Company
through which he did business, and after getting the ear of
the driver who had delivered to him the oil, told this driver
that a mistake had been made, that his oil had been mixed
on him. Riley testified that he told the driver to come and
take back the oil Sunday morning. He testified: "They told
me they would come on Sunday, but did not come until Mon-
day." The driver of the wagon admitted receiving notifica-
tion from Riley that the oil was mixed; that at the time of the
conversation over the telephone he had stated to Riley that
it was impossible that a mistake had been made, but that
if such was the case the wagon had been loaded up "wrong"
on him. He testified that he believed he said he would
take the oil back; further, that he was not convinced that
a mistake had been made until he went for the oil on Monday
morning. He denied having promised to return on Sunday
morning, and said that he could not have done so because
Riley did not keep his store open on Sunday. There was tes-
timony from which the jury was authorized to draw the
conclusion that had the oil delivered to Catlin been kerosene,
and not gasoline, the ignition of the oil and vapor and conse-
quent explosion would not have occurred. In short, there
was sufficient proof, in a circumstantial way at least, upon
which the jury was authorized to make the deduction which
is implied from the verdict, to wit, that the oil delivered to
Catlin was much more inflammable and explosive in its
character than kerosene, and that it was in fact gasoline.

Appellant first urges that there is a defect in the founda-
tion of plaintiff's case which requires that the judgment be
reversed. This contention is referred to the evidence which,
it is urged, fails to show that the negligence of appellant
was the proximate cause which produced the death of plain-
tiff's intestate. No contention is made but that the mistake
of appellant's agents in delivering both gasoline and kero-
sene in the place of kerosene to Riley, the grocer, was negli-
gence for which the corporation might, in some circum-
stances, be held responsible in damages. It is, however,
insisted that whatever negligence was first committed by
appellant in delivering mixed oil, this negligence ceased to

be of active effect in the line of causation when Riley, the grocer, discovered that he had received gasoline and kerosene mixed. It is argued that when Riley notified the driver that the oil was mixed, and it was understood that the driver would return and take it back, all responsibility of appellant ended; that the subsequent acts of Riley in selling the oil were the acts of an independent, responsible person which interrupted the chain of causation and furnished in law the last efficient cause of the damage. Proximate cause has been defined many times in the decisions, and by text-writers, to be that cause arising out of a breach of duty which, in a natural and continuous sequence, produces the damage complained of. The original negligent act may be separated from the untoward event by great periods of time and many other connecting acts, negligent or non-negligent. The latter may be acts of third persons not in any representative sense the agents of the first wrongdoer. There is a qualification, however, to the last-named condition, and that is this: When there is no privity of contract between the first wrongdoer and the person suffering damage, and the negligent act falls within the class concerning things which carry no menace or threat of probable damage to third persons, the liability of the first party will extend no further than to his immediate co-contractor. This rule applies generally to cases where breach of contract has been committed in the furnishing of merchandise, or building of tools, machines, etc., which in their very nature are not calculated to produce damage when of imperfect construction or composition. The mislabeling of poisons, inflammable oils, explosives, and like dangerous substances is so fraught with possibilities of danger to purchasers as to charge the first vender with a responsibility for damages, even though the mismarked substance has passed through the hands of a number of intermediate venders. (*Elkins Bly & Co.* v. *McKean,* 79 Pa. St. 493; *Riggs* v. *Standard Oil Co.,* 130 Fed. 199; *Wellington* v. *Downer Kerosene Oil Co.,* 104 Mass. 64; *Thomas* v. *Winchester,* 6 N. Y. 397, [57 Am. Dec. 455].) The interrupting event which will disturb the train of causation may be the negligent act of a responsible person. "If the negligent acts of two or more persons, all being culpable and responsible in law for their acts, do not occur in point of time, and the negligence of one only exposes the injured person

to risk of injury in case the other should also be negligent, the liability of the person first in fault will depend upon the question whether the negligent act of the other was one which a man of ordinary experience and sagacity, acquainted with all of the circumstances, could reasonably anticipate or not. If such a person could have anticipated that the intervening act of negligence might, in a natural and ordinary sequence, follow the original act of negligence, the person first in fault is not released from liability by reason of the intervening negligence of another. If it could not have been thus anticipated, then the intervening negligent person alone is responsible." (1 Shearman and Redfield on Negligence, 6th ed., sec. 34.) Thus it has been held that where a defendant had negligently constructed a fence and some panels having fallen out, these panels were picked up by a third party and placed against the fence in an insecure position from which they again fell, injuring a child, the defendant was held to have furnished the proximate cause of the injury, notwithstanding that had the panels been allowed to remain where they had first fallen no injury would likely have resulted; the court saying: "When there is danger of a particular injury which actually occurs, we must surely say that it is the usual, ordinary, natural and probable result of the act of exposing the person or thing injured to the danger." (*Fishburn* v. *Burlington & N. W. Ry. Co.*, 127 Iowa, 483, [103 N. W. 481].) The case last cited contains a collection of authorities treating of proximate cause and its relation to other acts intervening before the injury and contributing to the cause. No difficulty is encountered in giving a definition to the phrase "proximate cause." The difficulty in many cases is to determine which, among several concurring causes, is the active, efficient, and producing agency in working the damage. In following the train of causation to the end of a prolonged chain of acts involving perhaps negligence on the part of third persons, the test as to the original wrongdoer's liability depends upon whether, as a reasonable man, in all the circumstances of the case, he could or should have anticipated that the damage complained of might probably occur. As said by Justice Strong in *Milwaukee & St. Paul Ry. Co.* v. *Kellogg*, 94 U. S. 469, [24 L. Ed. 256]: "The primary cause may be the proximate cause of a disaster, though it may operate through suc-

cessive instruments, as an article at the end of a chain may
be moved by a force applied to the other end, that force being
the proximate cause of the movement, or as in the oft cited
case of the squib thrown in the market place.    The question
always is: Was there an unbroken connection between the
wrongful act and the injury, a continuous operation?    Did
the facts constitute a continuous succession of events, so
linked together as to make a natural whole, or was there some
new and independent cause intervening between the wrong
and the injury? . . . The inquiry must, therefore, always
be whether there was any intermediate cause disconnected
from the primary fault, and self-operating, which produced
the injury.''    In some of the cases first cited in this opinion,
where oils and medicines had been sold in a manner not indi-
cating their true character, or bearing some mistake in label,
it seems to be intimated that the original vender who caused
the mistake to be first made will be held liable, unless some
of the intermediate sellers have been guilty on their part of
negligence in dispensing the oil or drug.    Such is the court's
intimation in *Wellington* v. *Downer Kerosene Oil Co.*, 104
Mass. 64; *Elkins, Bly & Co.* v. *McKean*, 79 Pa. St. 493, and
*Thomas* v. *Winchester*, 6 N. Y. 397, [57 Am. Dec. 455].    The
facts in this case show that Riley, the grocer, had had long
experience in the handling of kerosene and gasoline and that
he was a dealer in such merchandise.    Appellant suggests
and insists that the legal situation illustrated by the evidence
here is no different than had appellant's driver, immediately
after delivering the oil to Riley, notified him that a mistake
had been made, and that gasoline and kerosene had been
mixed and that the company would take back the oil.    In the
latter case it is argued, and the conclusion suggested seems
logical, that had Riley determined then to dispose of some
of the mixed oil, relying upon his own judgment or knowl-
edge in the matter of determining its true character, the re-
sponsibility for any damage which might result would not
attach to the appellant corporation, but that for any mis-
take made by the groceryman which might result in damage
to his patrons, Riley alone could be held accountable.    There
is no doubt at all but that Riley would have had the right
to depend upon the implied representation made by the com-
pany that the oil was of the particular kind ordered by him,
where he was not put upon notice of the fact that kerosene

had been mixed with the more inflammable liquid. On Saturday, after the several lots of oil had been returned to Riley, and had been found to contain gasoline, and Riley had proceeded to make his own tests, he then had the conversation with the agent of appellant and the agreement clearly implied from what is admitted to have been then stated was that the company would take the oil back. Riley, as an experienced handler of oils, knew of the highly inflammable quality of gasoline, and it could hardly be said that the appellant, in order to absolve itself from liability, should have specifically advised him not to sell any of the liquid. Riley himself admitted that he would not have been sure in his own mind from the tests made of the two five-gallon cans which he supposed contained coal-oil, of the exact character of that oil, providing it had been mixed with gasoline and had not been entirely one or the other. He testified that he made fire tests of the liquid from the two cans which he concluded contained gasoline, but that he contented himself with noticing the odor and the rapidity with which the liquid from the other two cans evaporated. We cannot on the admitted facts distinguish this case from a case where the oil had been sold as claimed, and upon notification from Riley to the company of the state of affairs the company had immediately dispatched their wagon to take the oil back, and that while the wagon was waiting outside for that purpose Riley tested up some of the oil and sold it with the same disastrous consequences which did ensue. It was not incumbent upon appellant to have taken more steps than it did to prevent the independent action of Riley. Its responsible duty to third persons had ended. We have already pointed out that Riley was a dealer in both gasoline and coal-oil, and he had had many years' experience in handling those commodities. He himself testified that he had received and sold gasoline and kerosene for about ten years. In the view we take of the case, the intervening act of Riley was that of a culpable, responsible person, and that it interrupted the chain of causation and furnished the direct and proximate cause of the damage. In the case where poison was mislabeled as a harmless drug (*Thomas* v. *Winchester*, 6 N. Y. 397, [57 Am. Dec. 455]), it seems quite clear that had the retail druggist who received from the defendant, and later dispensed the poison, had notice of the fact that the drug had been mislabeled and

notice of its true character, his act in dispensing it, even though after the making of some tests, would be an act for which the original vender would not be liable. As the court there said: "The wrong done by the defendant was in putting the poison, mislabeled, into the hands of Aspinwall, as an article of merchandise, to be sold and afterward used, as the extract of dandelion, by some person then unknown."

But it is said by respondent that, under the facts and circumstances shown in evidence, it became a question solely for the jury to resolve as to whether there had been any negligence on the part of the plaintiff. It is true that questions involving alleged negligent action which turn upon the proposition as to what should be expected of an ordinarily reasonable man under the circumstances, present mixed questions of law and fact which generally should go to the jury under proper instructions as to the law, leaving the deductions of fact to be made by the verdict. This is always the case where the evidence is conflicting. However, it has been uniformly held that where the facts are undisputed and clearly settled, and the dictates of common prudence point to only one reasonable conclusion, the question is then one of law for the court and a verdict may be either directed or a nonsuit granted. (1 Shearman and Redfield on Negligence, 6th ed., sec. 56.) Our supreme court has repeatedly applied this rule. (*Glascock* v. *Central Pac. R. R. Co.*, 73 Cal. 137, [14 Pac. 518]; *Baddeley* v. *Shea*, 114 Cal. 1, [155 Am. St. Rep. 56, 33 L. R. A. 747, 45 Pac. 990]; and a number of other cases which it is unnecessary to cite.) We think in this case that it must be said that there should be no difference of opinion in the mind of any reasonable man, but that the appellant was shown to have exercised reasonable caution, when its driver informed Riley, the dealer, that he would take the oil back upon being informed by Riley that the fluid was mixed. No assurances were made to Riley designed to dissuade him from his conviction that the oil had been mixed, but the transaction or sale to him was agreed in effect to be rescinded. Riley himself had had abundant proof that the fluid delivered was not unmixed kerosene.

It is contended that prejudicial error was committed by the trial court in refusing to strike out portions of statements made by the deceased Catlin. As has been narrated, Catlin immediately after the explosion, and while he was upon the

grass in front of his house covered with fire, made a statement to the witness Tucker as to how the accident occurred, and then said: "I am sure that it was gasoline." He made another statement to which attention has not heretofore been called, to witness Siemsen, who arrived on the ground a few moments after Tucker came. In that statement, after some words had passed between the two men, the deceased said to Siemsen that "there must have been something in that coal-oil." Both of these statements appellant moved the court to strike out on the ground that they were not a part of the *res gestae,* that they were self-serving and expressive of the opinion and conclusion of the witness. It may be assumed that the statements made by the deceased were sufficiently contemporaneous with the occurrence as to admit them in proof as part of the *res gestae (Elkins, Bly & Co.* v. *McKean,* 79 Pa. St. 493), but it does seem quite clear that the particular sentences objected to could not have been competent in any case; they were not statements expressive of how the accident occurred, for the witness had already described what had happened, but presented purely the opinion and conclusion of the deceased as to the fluid which he was using being gasoline. The matter of the establishment of the fact as to the character of the fluid involved was one of the crucial issues in the case, and one as to which there was a conflict in the evidence. This statement coming from the deceased may have had deciding weight in settling the important question, and that consideration therefore clearly illustrates the prejudice suffered by appellant. For a discussion of what constitutes proper testimony where statements of the actors are claimed to be a part of the *res gestae,* we refer to *Heckle* v. *Southern Pacific Co.,* 123 Cal. 441, [56 Pac. 56]; *Williams* v. *Southern Pacific Co.,* 133 Cal. 550, [65 Pac. 1100].

As to the claim made that Catlin, as a matter of law under the facts shown in evidence, was guilty of contributory negligence, we think that contention should not be sustained. While it may appear to the ordinary mind as a heedless act for a man to fill a lamp with an open flame on his cap, at the same time, it must be borne in mind that there was evidence given by a witness, who was shown to have some expert knowledge on the subject, that such a thing might be done with reasonable safety and without great danger of the oil or vapor being ignited, if the fluid used was coal-oil of ordi-

nary lamp quality. Under this state of the evidence, it was for the jury to settle the question as to whether the deceased acted with reasonable caution in the circumstances. The case of *Riggs* v. *Standard Oil Co.*, 130 Fed. 199, cited by appellant, presented different facts. In the decision the district judge held that the pouring of oil by the person injured into a fire-box of a stove in which were live coals was contributory negligence which would prevent a recovery, even though the oil furnished was not of the high flash test required. The injured person in that case actually brought the oil in contact with fire. Hence it was clear that of whatever higher test the oil might have been, nothing could have prevented its ignition; the conclusion of negligence was irresistible. It is contended that the court erred in refusing to give certain instructions offered on the part of appellant. It was error not to instruct the jury in accordance with the conclusions expressed in the foregoing as to the conditions under which the first negligence of the appellant ceased to be of contributing influence in the chain of causation. Appellant was entitled to an instruction, as we view the case, that as a matter of law under the facts shown, responsibility, if any, was that of Riley, the immediate vender of Catlin. In other respects the charge as given by the trial judge appears to have contained in the main a correct exposition of the law. Those instructions furnishing more explicit advice on the subject of contributory negligence might well have been given, but we think it was not error to have refused them. As to the alleged excessive amount of the verdict, we would not feel justified in reversing the cause for that reason. (*Morgan* v. *Southern Pac. Co.*, 95 Cal. 501, 508, [30 Pac. 601]; *McGrory* v. *Pacific Electric Ry. Co.*, 22 Cal. App. 671, [136 Pac. 303].)

The judgment and order are reversed.

Conrey, P. J., and Shaw, J., concurred.