[Civ. No. 14781.   First Dist., Div. One.   Dec. 21, 1951.]

LUCILLE É. GALL et al., Respondents, v. THE UNION ICE COMPANY (a Corporation) et al., Defendants; STAUFFER CHEMICAL COMPANY (a Corporation) et al., Appellants.

304

Edward J. Niland, Campbell, Hayes & Custer, Robert E. Hayes and Frederick W. Mielke, Jr., for Appellants.

Keith, Creede & Sedgwick for Respondents.

BRAY, J.—From a judgment in the sum of $100,000 in favor of plaintiffs based on a jury verdict, all three defendants appealed. Apparently, however, defendant Union Ice Company[1] has abandoned its appeal. Our consideration, therefore, is solely of the appeals of defendants Stauffer Chemical Company[2] and Braun-Knecht-Heimann Chemical Company.[3]

## QUESTIONS PRESENTED

In addition to the sufficiency of the evidence as to liability and damages, the main questions are: (1) What is the degree of care required of the producers and sellers of sulphuric acid as regards giving warning to users? (2) What was the proximate cause of the accident?

## GENERAL FACTS

There is no dispute as to the cause of the accident upon which this action is based. On February 28, 1947, two drums of sulphuric acid were delivered to the San Jose plant of Union. They were purchased by Union from Braun, who, in turn, bought them from Stauffer, the producer. From date of delivery until August 4 the drums were left out in the sun and weather at Union's plant, on which date one of them burst. No one was assigned by Union to care for these drums. They were never opened or vented in any way to relieve pressure. When sulphuric acid comes in contact with the steel interior of the drum, it gradually corrodes the metal, producing hydrogen gas and iron sulphate in the process. The gas causes an increase of pressure inside the drum and sooner or later the drum will burst. Heat hastens the process. It is necessary that these drums be kept out of the sun and that

---

[1]Herein referred to as "Union."

[2]Herein referred to as "Stauffer."

[3]Herein referred to as "Braun."

about once a week the bungs be opened, thereby releasing the pressure. The drum that burst was badly bulged before it burst. The other drum was also bulging.

Plaintiffs are the widow and daughter of William T. Gall, Jr., deceased. At the time of the accident he was a sergeant in the United States Army on temporary duty at Union, supervising the purchase of meats for the Army, some of which meats were in storage there. He was standing several feet from the drums when the one burst. He was hit by the head of the drum, receiving injuries from which he died two days later. The main factual dispute is whether when delivered these drums were warning-labeled and whether Union had been warned and knew of the dangerous propensities of sulphuric acid in steel drums and how they should be handled.

## WERE THERE WARNING LABELS, AND DID UNION KNOW OF THE DANGER?

None of the Braun or Stauffer employees testified to the condition of these drums as to warning labels at the time of delivery. It is the custom among manufacturers and sellers of sulphuric acid to place labels on the drums, instructing users not to store them in the sun or near heat and to vent them at least weekly. The Stauffer plant superintendent testified that he personally inspected every drum in the shipping pile to make certain it had the warning label; that no drum of sulphuric acid ever went out of the plant without having a label pasted to it, stating, "Keep the plug up to prevent leakage, do not drop, keep drum out of sun, and away from heat; relieve internal pressure when received and at least weekly thereafter by slowly loosening plug." It was Stauffer's custom and practice to place warning paper labels on the drums with "tin paste." However, concentrated sulphuric acid falling on paper will quickly decompose and disintegrate it, as well as the glue or paste used. One of the experts for Braun and Stauffer testified that in his opinion the burst drum had been bathed in sulphuric acid. Stauffer's shipping department had been instructed that every drum before being sent out was to have the warning label on it. All drums were shipped out by the Clark Drayage Company whose drivers also checked the labels on the drums and called to Stauffer's attention any labels which were torn or mutilated in loading. One of Stauffer's salesmen said he had seen many drums ready for shipment, but had never seen one that was not labeled. Stauffer advises its customers to vent drums at least

once a week. It passes on to its customers circulars and instructions received from the Manufacturing Chemists' Association. Before the war, the district sales manager had prepared a mimeographed sheet condensing the pertinent directions given by the association. This sheet was sent to all Stauffer's customers and is still given to new customers. This stated that drums should be vented weekly by loosening the bung to prevent possibility of explosion. While he was sure one was sent to Braun he could not swear to it. The same applied to a copy of Manufacturing Chemists' Association Manual Sheet D 31 which called attention to the danger of the drum bursting unless internal pressure is periodically vented, and that drums should not be stored in the sun.

The custom and practice of Braun was confined to checking for the labels put on by Stauffer and to replace any which were missing or defaced. The drums are checked for labels when received by the foreman of the warehouse and by the order clerk, and double checked when shipped out. Seldom did a drum come in from Stauffer with the label missing. In checking for labels Braun operated under a number of different regulations and requirements, including those of the Bureau of Explosives, the Federal Caustic Poison Act, requirements of the State of California on the sale of economic poisons, the Industrial Accident Commission, and the recommendations of the Manufacturing Chemists' Association. The warehouse personnel is given lists of commodities requiring markings, and a part of their duties is to inspect the packages to be sure that the required markings are shown. Braun's customary procedure was to store sulphuric acid drums in a cool place and vent at least once a week. In 1943 the sales manager had sent to all purchasers of sulphuric acid a letter warning them about the proper methods of handling and storing these drums. Braun's salesman kept instruction warning sheets and handed some of these out to his customers. He did not recall whether he had given any to Union.

Stauffer has been selling these drums of sulphuric acid to Braun for over 30 years. Union has purchased 260 drums from Braun since 1931. Thirty-three were bought in the year of the accident and 48 the year before. Union has 50 to 60 plants in California. At its San Jose plant it used about three drums a year.

The chief engineer of that plant was a member of the safety committee of the plant. About a week before the accident he noticed that the ends of both drums were bulged

out. He did not report this although he had noticed that the ends were flat when the drums were received and he assumed that the bulging was caused by some sort of internal pressure. After the accident, the ends of the non-bursted drum were found to be very obviously bulged. Its bung could not be loosened because it had become too corroded with iron sulphate. After the accident no warning labels could be found on either drum. Two labels that were not warning labels were found on the drums. They were badly weathered, mutilated and difficult to read. A metallurgical engineer with extensive experience in the handling of sulphuric acid testified that there was an area on the exploded drum which had the "common appearance of an area bearing a label which has been spattered with sulphuric acid in the glue." It was an area where Stauffer had customarily attached its warning label.

The Union plant engineer to whom the drums were originally delivered testified that while he saw labels on the drums to the effect that when empty they should be returned, he saw no warning labels, nor did he see any during the entire time the drums were there. He looked the drums over to see if they had any stickers giving their weight and was sure there were no warning labels there. Union's chief engineer, who was then working at the San Jose plant, was present at the delivery of the drums and helped roll them off the truck, testified that there were no warning labels on them, just a label having to do with their return when empty. He examined the drums after the accident and found no warning labels. A licensed private investigator and two testing laboratory engineers, examining the drums for warning labels the day after the accident, found none, nor any indication that there had been any. A salesman for Stauffer examined the burst drum and was unable to find trace of any warning label. The words "sulphuric acid" were stencilled in large letters across the end of each drum.

There was no evidence that the Union employees knew of the danger of leaving the drums in the sun and unvented. Chief Engineer Graves, chairman of the plant's safety committee, the assistant foreman, and the assistant chief engineer, all testified that they had never received instructions concerning the danger from nor the method of handling the drums, and did not know of such danger.

Our duty on the factual end of the case is to determine whether there is substantial evidence, together with the reason-

able inferences therefrom, to support the implied findings of the jury. The testimony of the two Union employees who were present at the delivery of the drums, together with that of a number of the witnesses who examined the drums after the accident, substantially supports the jury's implied finding that there were no warning labels on the drums at the time of delivery to Union, in spite of the testimony of defendants' witnesses as to the customs of Stauffer, Braun and the delivery company concerning labeling. Likewise the testimony of the Union employees that they neither knew nor were told about the danger of the drums, constituted substantial support for the implied finding that Union had neither warning nor knowledge of the danger, in spite of the evidence concerning custom of Braun and Stauffer to warn their customers. This brings us to the questions of law.

## DUTY OF MANUFACTURER AND DEALER

The negligence charged against Braun and Stauffer is that they violated the duty of the manufacturer and seller of a dangerous commodity to warn the purchaser of the danger. The rule is stated in Restatement, Torts, page 1039, section 388: "One who supplies directly or through a third person a chattel for another to use, is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be in the vicinity of its probable use, for bodily harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier (a) knows, or from facts known to him should realize, that the chattel is or is likely to be dangerous for the use for which it is supplied; (b) and has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be so." Comment (c) includes "vendors" as "suppliers." (P. 1041.) "g. The duty, which the rule stated in this Section imposes upon the supplier of a chattel for another's use, is to exercise reasonable care to give to those who are to use the chattel the information which the supplier possesses and which he should realize to be necessary to make its use safe for them and those in whose vicinity it is to be used. . . . There are many chattels which, even though perfect, are unsafe for any use or for the particular use for which they are supplied unless their properties and capabilities are known to those

who use them. If such a chattel is supplied to another whom the supplier should realize to be unlikely to know its prop. erties and capabilities, the supplier is required to exercise reasonable care to give to the other such information thereof as he himself possesses.'' (Pp. 1043, 1044.) ''j. The supplier's duty is to exercise reasonable care to inform those for whose use the article is supplied of dangers which are peculiarly within his knowledge. If he has done so, he is not subject to liability, even though the information never reaches those for whose use the chattel is supplied. The factors which determine whether the supplier exercises reasonable care by giving this information to third persons through whom the chattel is supplied for the use of others, are stated in Comment 1.'' (P. 1048.) Comment 1 indicates the necessity of a warning label where practical. ''The courts have frequently ruled that a manufacturer must give an appropriate warning of any known dangers which the user of his product would not ordinarily discover. . . . The likelihood of an accident taking place and the seriousness of the consequences are always pertinent matters to be considered with respect to the duty to provide a sufficient label. (See Rest., Torts, §§ 291, 388, comment 1, pp. 1051-1052; § 397, comments (b-d).) Defendant knew of all the perils involved, and it was for the jury to determine whether defendant should have foreseen that workers in the tool company's shop might fail to take all necessary precautions to avoid contamination in the absence of a warning. On the other hand, the jury could properly conclude that without such a warning label neither Tingey nor any other tool company employee was bound to anticipate that there would be a violent chemical reaction or explosion upon the mixing and heating of the two salts . . .'' (*Tingey v. E. F. Houghton & Co.,* 30 Cal.2d 97, 102, 103 [179 P.2d 807].)

### STAUFFER'S NEGLIGENCE

Stauffer contends, in addition to the contentions also made by Braun, that there was no evidence of negligence on its part, pointing out that there is no direct evidence of the condition of the drums as to labeling when delivered to Braun about 10 days prior to their delivery by Braun to Union. As hereinbefore set forth, there was positive evidence that there were no warning labels on the drums when received at Union nor any indication that there ever had been any. True, one witness testified that after the explosion he saw indications on one of the drums that it had been

warning-labeled. That, however, merely created a conflict in the evidence which it was the duty of the jury to resolve. The fact that 10 days later there were no warning labels or indications of them on the drums, particularly in view of the fact that the labels requiring return of the drums were still on, raises the reasonable inference that the drums were not warning-labeled, or if they were, the labeling was of such a flimsy type as not to meet the requirement of ordinary care. The fact that Stauffer kept Braun supplied with extra warning labels to replace any missing or damaged would not relieve Stauffer of its duty to label properly. Actually, this fact raises the reasonable inference that Stauffer knew or believed that some drums would be delivered to Braun unlabeled, or at least that the labels were not attached securely.

Stauffer takes the position that because its custom was to warning-label its drums, it had met the duty imposed upon it, even though it should appear that in spite of that custom drums left the plant unlabeled. That this is not the law is shown by the first case cited by Stauffer as support for its contention, *Tingey* v. *E. F. Houghton & Co., supra,* 30 Cal.2d 97. There the court said (p. 101): "Although the testimony of the plant manager, if believed by the jury, would indicate that defendant exercised great care to prevent contamination, it is not sufficient as a matter of law, under all of the facts of this case, to compel a finding that the product was pure when shipped. It does not necessarily follow from the fact that defendant ordinarily exercised great care that departures from the usual practice were never made." In *Means* v. *Southern California Ry. Co.,* 144 Cal. 473 [77 P. 1001, 1 Ann.Cas. 206], the court stated that there was nothing in the evidence to show that sulphuric acid in drums was essentially and inherently a dangerous agency. However, there the court was talking about the peculiar facts of that case. A drum burst while in the possession of a carrier. The evidence failed to disclose what caused it. The court even stated that it did not require more than ordinary care in handling it. The evidence in our case, however, shows just the contrary—that unless handled with more than ordinary care sulphuric acid in drums is dangerous. However, this fact, as held in the Means case, is not generally known. Hence arises the duty of the producer and seller, who know this dangerous characteristic, to give reasonable warning to those who may reasonably be expected to come in contact with it. Of course, there is no absolute liability for harm done by

sulphuric acid, but if the producer or vendor, knowing that if not properly handled it will be dangerous, permits it to leave his premises without being properly labeled as to warning, the mere fact that it was his custom to label it will not relieve him from a charge of negligence.

### NEGLIGENCE OF BRAUN

Braun contends that, assuming the drums· were not labeled at the time of delivery, Braun as a distributor is not liable, as sulphuric acid is not explosive and that Braun had the right to assume that Union as a user of that acid for many years was aware of the danger of not keeping the drums cool and vented. The rule stated in the Restatement requires a situation where the vendor realizes or should realize that the commodity is dangerous. ''i. *When warning of defects unnecessary*. One who supplies a chattel to others to use for any purpose is under a duty to exercise reasonable care to inform them of its dangerous character in so far as it is known to him or of facts which to his knowledge make it likely to be dangerous, if, but only if, he has no reason to expect that those for whose use the chattel is supplied will discover its condition and realize the danger involved · therein.'' (Rest., Torts, p. 1047.) Whether such a situation existed here was for the jury to determine. (*Tingey* v. *E. F. Houghton & Co., supra*, 30 Cal.2d 97.) The fact that Union had used 260 drums of sulphuric acid in its various plants over a 10-year period (however, the evidence fails to disclose any bursting of drums during that period) the possibility that labels may have been on many of them, and the training of the Union personnel in refrigeration and safety, do not compel a finding that Union must have known of the danger or that Braun was not negligent in failing to appreciate that the danger which Braun knew to exist would not be known to its customers.

### WAS UNION'S NEGLIGENCE THE SOLE PROXIMATE CAUSE OF THE ACCIDENT?

Both Braun and Stauffer contend that it was. They contend that the fact that Union's assistant engineer saw the bulged condition of the drums and knew that it was caused by some sort of internal pressure, and did nothing about it, makes such failure to act the sole proximate cause of the accident. This fact undoubtedly constituted negligence on the part of the engineer, but it was not the sole cause of the accident. The delivery to Union of the drums which the

vendor knew would be likely to burst if not kept cool and vented, without any warning to the purchaser of that fact, combined with the engineer's failure to act, caused the accident. Had there been a warning on the drums, the engineer most likely would have done something about the bulging and thereby prevented the accident. In that event, whether he did or not, Braun would have met its duty.

In *Northwestern etc. Ins. Co.* v. *Rogers etc. Foundry,* 73 Cal.App.2d 442 [166 P.2d 401], defendant shipped to the purchaser five sacks of magnesium castings which were negligently included in an order of aluminum castings, knowing they were to be immersed in a molten salt bath at over 925 degrees temperature. When so immersed a violent explosion took place causing the damages for the recovery of which the action was brought. The manager of the purchaser before immersing the castings noticed that the color of the castings and the weight differed slightly with that of the other castings in the same shipment. Defendants contended that their concurrent negligence was the remote cause of the accident and that the proximate cause was the manager's negligence by which he became the independent intervening cause. The court held the contention untenable and said (p. 444) : "This proposition is untenable since the law is settled in California that an intervening act of a third person, negligent in itself, is not a superseding cause of injury to another which the actor's negligent conduct is a substantial factor in bringing about, if (1) the actor at the time of his negligent conduct should have realized that a third person might so act, or (2) a reasonably prudent man knowing the existing situation when the act of the third person was done would not regard it as highly extraordinary that the third person should so act. [citing cases.]" Applying this principle to the facts of our case, it was for the jury to determine whether (1) the suppliers of sulphuric acid should have realized that Union employees, if not properly warned, would not have known of the danger of the drum bursting, and (2) whether a reasonably prudent person, knowing what the Union engineer knew when he saw the bulges in the drum, would not regard it as highly extraordinary and would do nothing about that bulging. We cannot say that, under the evidence, the jury's determination was not a reasonable one, nor unsupported. *Stasulat* v. *Pacific Gas & Elec. Co.,* 8 Cal.2d 631 [67 P.2d 678], is not in point here for the reason that under the facts of the case, the court held that although it is not necessary

to preserve the chain of causation from the original negligence, "the precise nature of the second negligent act should reasonably have been anticipated, it is necessary that some such negligence should have been anticipated as reasonably likely to follow as a natural and ordinary consequence of the situation created by the original negligent act" (pp. 637-638) and that the negligence of appellant as a matter of law was not of the type as reasonably likely to cause the accident which took place. We certainly cannot say as a matter of law that suppliers of this acid should not reasonably have expected the consequences which occurred. On the contrary, the evidence shows that the fear of occurrences such as the bursting of the drum here was the reason for Braun and Stauffer attaching warning notices to their drums. *Waterman* v. *Liederman,* 16 Cal.App.2d 483 [60 P.2d 881, 62 P.2d 142], held that the maker of automobile tires is not bound to anticipate the gross carelessness of automobile drivers. Obviously there is a vast difference between a tire and a drum of sulphuric acid. Nor is *Catlin* v. *Union Oil Co.,* 31 Cal.App. 597 [161 P. 29], in point. There, by mistake, the appellant delivered to a grocer mixed kerosene and gasoline. However, the error was discovered, the grocer was notified of it and that the defendant would take it back. The grocer, claiming to be an expert, without the knowledge of the company attempted to test and segregate the oils. He then sold as kerosene to a purchaser a container which he had determined contained kerosene only, but which actually contained gasoline. The purchaser using it as kerosene caused an explosion in which he received fatal injuries. The court refused to hold appellant liable for the reason that "there should be no difference of opinion in the mind of any reasonable man, but that the appellant was shown to have exercised reasonable caution, when its driver informed Riley, the dealer, that he would take the oil back upon being informed by Riley that the fluid was mixed. No assurances were made to Riley designed to dissuade him from his conviction that the oil had been mixed, but the transaction or sale to him was agreed in effect to be rescinded. Riley himself had had abundant proof that the fluid delivered was not unmixed kerosene." (P. 609.) No analogy exists there to the facts in our case.

## ALLEGED ERRORS

### (1) *The Contract*

█ The contract between Braun and Union covering the sale and delivery of the two drums was offered in evidence

by Braun and Stauffer, and admitted except as to paragraph 9, which was refused admission on the objection of both plaintiffs and Union. Defendants contend that the court erred in not admitting that portion of the contract which read: "Buyer assumes complete responsibility for any and all results, including damage to persons and property, obtained from handling, storage or use of said materials by Buyer or third persons, whether same are handled, stored or used singly or in combination with other products." Defendants concede that this clause could not affect their liability as to plaintiffs, but contend it was admissible on the issue of negligence as tending to establish a right of defendants to assume that Union would take reasonable care of the drums. The fact that the buyer had agreed to assume responsibility as between it and the supplier in nowise would justify the supplier in failing to perform its duty towards third persons or in assuming that it did not have to perform such duty. Moreover, Braun knew the danger from improper handling of the drums. The fact that the seller of a commodity which he knows is dangerous to handle obtains an assumption of liability from the purchaser could not relieve the seller of the duty to warn a buyer whom he does not know to have knowledge of the danger.

(2) *Warning Letter*

Mr. Harris, the sales manager of Braun's chemical division, testified that in 1943 the company sent to all sulphuric acid customers a letter calling attention to the hazards of that acid. He then produced from the company's files a copy of a letter dated August 16, 1943, to which was pinned a list of sulphuric acid customers as of that date, made up by the witness at the time, and which included Union. He was unable to testify whether such letter was actually sent to Union. He testified in detail as to the procedure followed in preparing and mailing these letters, basing his testimony upon his knowledge of the custom and practice of the office. Braun offered the letter and the list on the theory that they were admissible under the Uniform Business Records Act. An objection to the admission of the letter and the list was sustained. Assuming that section 1953(f) of the Code of Civil Procedure applies to situations of this kind (see *Hughes* v. *Pacific Wharf & S. Co.*, 188 Cal. 210 [205 P. 105]; *Oakland California Towel Co.* v. *Zanes*, 81 Cal.App.2d 343 [184 P.2d 21]), we cannot hold as a matter

of law that the court abused the discretion given it by the section. The section states: "A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, *and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.*" (Italics added.) The court for the reasons hereafter set forth might very well have been of the opinion that the sources of information, method and time of preparation were not such as to justify admission of the documents.

The jury had the benefit of the testimony of the sales manager to the effect that the company sent out the letter to all of their customers, of which Union was one. The source of the witness' information as to the sending of the letter to Union, was his knowledge of the custom of sending out such letters to the trade and his finding of a four-year-old copy of a warning letter attached to a list of customers. There was no testimony by anyone that the letters to Union had actually been sent out. The letters were sent out approximately four years before the accident. It is reasonable to conclude that the sending of such a letter to Union that far in the past would not have changed the jury's conclusion of negligence in view of their implied finding that the drums were not labeled when delivered. Obviously, Braun should have known that in view of the danger, a four-year-old notice would not relieve it of the obligation of labeling.

(3) *Statement of Union Agent*

After bringing out the fact that the day after the accident, Mitchell, Union's purchasing agent, talked to Harris, Braun's sales manager, concerning it, Braun asked for the conversation. Upon objection of plaintiffs the court refused to admit it. Braun contends that this constituted error. Braun offered to prove by Harris that Mitchell stated that the drum burst after having been exposed to the elements for several months without any venting. It is contended that from such statement it could be concluded that Union knew of the necessity for venting and hence was solely responsible for the accident. How such conclusion could be drawn does not appear. Mitchell's statement as to the cause of the accident agrees with the conclusions of the other witnesses and of the

parties. It was not claimed that Mitchell stated that prior to the accident he had any knowledge of the necessity for venting the drum or its condition, but merely that after the accident, at which he was not present, he stated its cause. Assuming that Union would be bound by the statement of its purchasing agent on this subject (see *Breland* v. *Traylor Eng. etc. Co.*, 52 Cal.App.2d 415 [126 P.2d 455], indicating that Union was not so bound), there was no error in denying the admission of the statement as it was irrelevant to the purpose for which it was offered.

### (4) *Bursting of Drum at Other Plant*

■ Over objections of Braun and Stauffer, evidence was admitted that on the same day as the accident here, a drum of sulphuric acid produced by Stauffer and delivered by Braun to the Crown By-Products Company in San Jose, had burst. There were four to six drums on these premises and only the ruptured drum had a warning label on it (a somewhat mutilated one), although there was testimony that on the others there were places indicating that there had been labels of the same size. There was no evidence as to the condition of the drums as to labels on delivery, how they had been handled, nor how long they had been on the premises, other than the plant manager's statement that he did not believe they had been there a year. They had been stored in the open but not vented. The evidence of the explosion was admissible for the purpose of showing the propensity of these drums to burst and hence their dangerousness, and also as bearing on the cause of the bursting of the Union drum. That Braun and Stauffer admitted these conclusions did not make the evidence inadmissible. Both Braun and Stauffer contended that invariably the drums were labeled when they were delivered. While the evidence was somewhat remote due to the fact that a considerable time had elapsed since delivery, that fact affected its weight rather than its admissibility. To some extent the evidence was favorable to Braun and Stauffer—it showed a label on one drum and indications that at some time there had been labels on the others. However, the jury was entitled to the evidence in determining whether Braun and Stauffer in labeling dangerous articles with paper labels which apparently did not remain on the drums with use, had exercised ordinary care. The paper label which was introduced in evidence and which certainly was admissible to show the type of label used, was

rather flimsy for the purpose of warning concerning a product which the sellers knew to be dangerous if not properly handled.

INSTRUCTIONS

(a) *Proximate Cause*

The court gave instructions on proximate cause which are substantially Nos. 104, 104A and 104B of B.A.J.I. Braun and Stauffer offered a series of instructions adapted from the Restatement, Torts, sections 431 and 432, which have been cited with approval in, among other cases, *Mosley* v. *Arden Farms Co.*, 26 Cal.2d 213 [157 P.2d 372, 158 A.L.R. 872]. In spite of the criticism in Prosser, *Proximate Cause,* in 38 California Law Review 369, 424, we find no error. The offered extracts from the Restatement are hardly less abstruse than defendants claim those given were. An instruction the same as B.A.J.I. No. 104 was approved in *Chutuk* v. *Southern Counties Gas Co.*, 21 Cal.2d 372, 380 [132 P.2d 193]. Substantially the same instructions as 104A and 104B were found sufficient in *Dieterle* v. *Yellow Cab Co.*, 53 Cal.App.2d 691 [128 P.2d 132]. After commending the use generally of B.A.J.I. instructions, the court in *Dodge* v. *San Diego Electric Ry. Co.*, 92 Cal.App.2d 759 [208 P.2d 37], said (p. 763): "There is abundant authority to the effect that it is not necessary for the court to give instructions in the particular language requested. If the subject matter is properly covered and the law applicable to the case is fairly and fully given, that is sufficient."

(b) *Superseding Cause*

Offering an instruction on this subject, part of which is taken from section 447, Restatement, Torts, Braun and Stauffer concede that the instructions given by the trial court on the subject were "not incorrect" but claim they were inadequate. Actually the instructions on this subject given by the court were clearer and less abstruse on superseding cause than the proposed ones. We find the instructions adequate.

(c) *Presumption*

Braun and Stauffer offered an instruction to the effect that "there is a legal presumption that the course of business has been followed and that a person, including a corporation, has not been guilty of an unlawful act. If you find that in the ordinary course of business, drums of sulphuric acid did not leave the plants of the two chemical companies

without labels advising users as to how to care for the same, the law presumes that the labels were attached to the drums.'' The court refused the instruction. Braun and Stauffer contend that this was error in view of the fact that the court instructed on the general subject of presumptions and that it was defendants' duty to give appropriate warning of any known dangers which the user of their product would not ordinarily discover. The proposed instructions were based on section 1963, Code of Civil Procedure, ''That a person is innocent of crime or wrong'' (subd. 1) ; ''That the ordinary course of business has been followed'' (subd. 20). This instruction was offered because of the testimony concerning the practice and custom of the chemical companies to attach warning labels to the drums, and the fact that no one of their employees was able to state that labels were actually on the drums in question when delivered by the respective companies. This instruction should have been given. They are disputable presumptions which, as stated by the court in its charge, should be weighed against the other presumptions, if any, and evidence in the case. In *People* v. *Layman,* 117 Cal. App. 476 [4 P.2d 244], the court said (p. 478) : ''Appellant complains that it was error, in violation of the hearsay rule, to permit the train dispatchers to testify that they had received no report of an accident. It was not hearsay, but direct proof, of course, of a fact, the fact being that no report had been turned in. This fact was material because of the presumption that the ordinary course of business had been followed (subd. 20, sec. 1963, Code Civ. Proc.) ; that is, that if there had been an accident it would have been reported to the dispatchers. 'The corroborative evidence may be slight.' '' However, in view of section 4½, article VI of the Constitution, we cannot say that the error was prejudicial. As a presumption is ''a deduction which the law expressly directs to be made from particular facts'' (Code Civ. Proc., § 1959), for the presumption to come into being the jury must first find the facts upon which it is based. Here, the jury had the evidence of the custom and practice before it. If it believed them to be as testified to by defendants, then the necessary inference was that these drums were labeled. The jury, either with or without the presumption, had to weigh this against the positive testimony that when delivered the drums were not labeled. It is not realistic to assume that in view of that fact the mere fact that the situation raised a presumption rather than the inference

which the jury must have considered, would have made any difference in their verdict.

## DAMAGES

■ The jury awarded plaintiffs $100,000 as damages. Defendants contend this is excessive. Deceased at the time of his death was 35 years old. His life expectancy as shown by the U. S. life tables was 34.36 years. Plaintiff Lucille was also 35 years of age and her expectancy was 37.71 years. They had a daughter 7½ years old. He was a sergeant in the United States Army. His base pay was $100 per month. An allotment of $80 per month was made his wife, and while on temporary duty he received $5.00 per diem. Altogether this totaled $330 per month. The evidence justifies the conclusion that as a meat and dairy inspector he would indefinitely receive this income, plus later additions in pay due to length of service. According to the testimony of an actuary it would take $89,655 to return $300 a month income at 2 per cent; $77,583 at 3 per cent; $67,821 at 4 per cent, and $59,859 at 5 per cent. To return $400 a month it would take $119,540 at 2 per cent; $103,444 at 3 per cent, $90,428 at 4 per cent, and $79,812 at 5 per cent. Defendants cite other cases on death awards as a criterion here. While they are of some value in determining the adequacy of the award it must be pointed out that the circumstances are not the same. Thus in *Holder* v. *Key System,* 88 Cal.App.2d 925 [200 P.2d 98], where this court upheld an award of $45,000, deceased was 56 years of age with a life expectancy of only 16.7 years, and was earning but $180 per month at the time of his death. At the time of the trial the job paid only $240 a month. His children were adults and his widow was 51 years of age. Moreover, we are in a period of inflation and the dollar is of less value than it was even only three years ago when that case was decided. As there pointed out, "Analysis of awards made in other similar cases, while of assistance, is by no means conclusive . . ." (p. 940) and the trier of fact should take into consideration in determining the amount of damages the fact of which judicial knowledge may be taken, that the purchasing power of the dollar has decreased (actually is still decreasing) and further (p. 940): "Another factor to be considered in cases involving damages for loss of a member of a family is that, although damages must be measured by the pecuniary loss to the plaintiffs, in fixing such loss the trier of the fact is not limited to proof of loss in dollars and cents, but may properly consider the pecuniary

value of the loss of such noneconomic interests of a family as loss of comfort, society and protection." In *Jennings* v. *McCowan*, 215 S.C. 404 [55 S.E.2d 522], the court upheld an award of $85,000 given a widow and two children. Seventy thousand was for actual damages, $15,000 punitive damages. There. the deceased was 56 years of age with an expectancy of only 16.2 years and his income was only $2,475 per year.

Another circumstance to be considered by this court is the fact that the trial judge, sitting as the thirteenth juror, has weighed the evidence, judged the credibility of the witnesses, and on motion for new trial determined that the verdict is not excessive. For us to upset this award we must find that it is so high as to suggest passion or prejudice. (*Holder* v. *Key System, supra*, 88 Cal.App.2d, at p. 940.) We cannot do so.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied February 18, 1952. Schauer, J., voted for a hearing.