JUAN E. MENDOZA, Plaintiff and Appellant, *v.* CERVECERÍA CORONA, INC., Defendant and Appellee.

No. R-67-94.    Decided June 27, 1969.

*José H. Picó* for appellant. *Carlos A. Chavier Stevenson* for appellee.

MR. JUSTICE DÁVILA delivered the opinion of the Court.

The plaintiff purchased two boxes of "Malta Corona" at a warehouse in Puerta de Tierra, for his itinerant business, devoted to the sale of refreshments, candies, and some foodstuff. The purchase was performed at about 2:30 in the afternoon. Three hours later he uncorked one of the bottles which he had previously refrigerated and began to drink its contents. When he was finishing he felt an unpleasant-tasting viscous sediment, of which there were residues at the bottom of said bottle. He showed them to a person who was standing by. The plaintiff suffered a stomachal intoxication, with the consequent nausea, vomiting, diarrhea and general discom-

fort. He was hospitalized in the Clínica Seín for two days, during which his stomach was washed, he was injected serum and was administered antacids and antispasmodics.

The complaint to recover damages filed against the Cervecería Corona, Inc., manufacturer of "Malta Corona", was dismissed. The court found that the implied warranty doctrine was not applicable and that the plaintiff did not prove that the defendant committed negligence. We agreed to review.

In *Castro* v. *Payco, Inc.*, 75 P.R.R. 59 (1953) we decided that the manufacturer of food products is liable to a person, who as consequence of having ingested such product, suffers an intoxication. The plaintiff in that case had purchased a coconut ice cream directly from an employee of the defendant company. In view of those facts, we said in the light of Act No. 72 of April 26, 1940, known as "Puerto Rico Food, Drug and Cosmetic Act", at p. 68:

". . . Consequently, when the manufacturer of an article used for food offers it for sale for human consumption, the presumption is that he has complied with the Act, that he has placed on the market an unadulterated article and that he warrants that it is fit for its intended use.

"The majority of states in which this question has arisen, adhere to the rule of implied warranty, that is, that the person who serves or sells food for human consumption impliedly warrants that the product is wholesome and fit for human consumption. . . . This doctrine is applicable in Puerto Rico according to the provisions of Act No. 72 of 1940 mentioned above."

In the case of *Castro* v. *Payco, Inc.*, the manufacturer himself sold the product. In the case at bar there exists no privity of contract between the plaintiff and the defendant corporation.[1] Should we extend the established doctrine to cases in

---

[1] The United States Court of Appeals for the First Circuit interpreted the case of *Castro* v. *Payco, Inc.* in *Coca-Cola Bottling Co. of Puerto Rico* v. *Negrón Torres*, 255 F.2d 149 (1958) as establishing liability without requiring privity of any sort. The Court expressed itself thus:

"We cannot, of course, be certain that the Supreme Court of Puerto

which there exists no privity of contract? Should the manufacturer merely guarantee that the product is wholesome or should a strict liability be imposed on him in order to guarantee it?

The first English criminal statutes imposing penalties upon brewers, butchers, and cooks who marketed adulterated or contaminated foods date from the year 1266. About the year 1431 various text writers were already pointing out a series of dicta in various cases upholding the strict liability of the food sellers on the basis of an implied warranty. See Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer)*, 69 Yale L.J. 1099, 1104 (1960).

Subsequently, in 1847 in the case of *Burnby* v. *Bollett*, 16 M. & W. 644, 153 Eng. Rep. 1348, the strict civil liability of the sellers of food to the consumers or buyers was indicated in a dictum. Subsequent decisions referred to a special kind of liability, which was identified later and acted jointly with the warranty, which imposed a strict liability upon manufacturers or food makers in favor of the consumer, under a principle of public policy: the preservation of health and human life. But this doctrine had the limitation that it only offered protection to those who purchased directly from the manufacturer. It originated from the erroneous interpretation given to the old English case of *Winterbottom* v. *Wright*, 10 M. & W. 109, 152 Eng. Rep. 402 (Ex. 1842).[2] To that

Rico would share our view and find merit in the exception to the general rule requiring privity between buyer and seller in actions for breach of implied warranty of fitness for intended use when articles for human consumption sold in sealed containers are involved. Nevertheless we feel justified in believing that the theoretically sound basis for the exception, and its intrinsic merit, would lead the Supreme Court of Puerto Rico to recognize the exception and hold when the occasion arises that as to the wholesomeness of food the implied warranty of fitness for human consumption is not grounded so much upon contract as upon the strong public policy, as clearly expressed in the local pure food and drug act, to preserve human health and even life itself."

[2] Soon it turned into the general rule of this field based on a rule of public policy: to protect the infant manufacturers from a universal

effect Prosser states, in his work Law of Torts (3d ed. 1964) at p. 658:

"The decision held only that no action could be maintained on the contract itself; but certain dicta of the judges, and particularly the words of Lord Abinger, who foresaw 'the most absurd and outrageous consequences, to which I can see no limit,' 'unless we confine the operation of such contracts as this to the parties who entered into them,' were taken to mean that there could be no action even in tort, and that this was true of any misperformance of a contract, including even the sale of a defective coach in the first instance. The error of this interpretation of the case has been exposed long since; but from it there developed a general rule, which prevailed into the twentieth century, that there was no liability of a contracting party to one with whom he was not in 'privity.' "

In order to overcome the rigor of the rule which was held as established in the *Winterbottom* case the American courts developed exceptions to the same.[3]

Relying on one of these exceptions, around the beginning of the second decade of this century, the courts, responding

---

liability to unknown persons, in an age when they were just appearing upon the fringes of the economy and were struggling to maintain an existence. See Hill, *Liability of Manufacturer in Absence of Negligence—1965*, ABA Section of Insurance, Negligence and Compensation Law 224 (1965); Phelps, *Extent of Manufacturer's Duty of Care to Persons Other Than the Immediate Purchaser*, 2 John Marshall L.Q. 387 (1937).

[3] See Prosser, *op. cit.* at pp. 659, 660 where he states:

"The courts began by developing several exceptions which whittled away the general rule derived from the supposed holding of *Winterbottom* v. *Wright*. The first was that if the seller knew that the chattel was dangerous for its intended use and failed to disclose that fact to the buyer, he became liable to a third person injured by such use, on the basis of 'something like fraud' in the intentional concealment. A second exception found liability where the chattel was furnished for use on the defendant's premises, treating the user as an invitee. The third, and most important exception held the seller liable to a third person in the preparation or sale of an article 'imminently' or 'inherently' dangerous to human safety. For more than half a century this category remained vague and imperfectly defined. It obviously included drugs, food and drink, firearms and explosives, but there was much pointless dispute as to how such products as soap, chewing tobacco, or the container of a beverage were to be classified."

to the outcry of citizens indignant at the abuses committed by the manufacturers and elaborators of food products, began to impose upon these manufacturers and elaborators a strict liability to consumers. *Mazetti* v. *Armour Co.*, 135 Pac. 633 (Wash. 1913) ; *Parks* v. *C. C. Yost Pie Co.*, 144 Pac. 202 (Kan. 1914) ; *Jackson Coca-Cola Bottling Co.* v. *Chapman*, 64 So. 791 (Miss. 1914). See Prosser, *op. cit.* at p. 674.

Until the year 1916 the rule in the majority of American jurisdictions was that unless some of the acknowledged exceptions to which Prosser refers could be applied, there existed no liability without a previous privity. *Huset* v. *J. I. Case Threshing Mach. Co.*, 120 Fed. 865 (8th Cir. 1903) ; *Catlin* v. *Union Oil Co.*, 161 Pac. 29 (Cal. 1916) ; *Cliff* v. *California Spray Chem. Co.*, 257 Pac. 99 (Cal. 1927).

In 1916 Judge Cardozo delivered his famous opinion in *MacPherson* v. *Buick Motor Co.*, 217 N.Y. 382; 111 N.E. 1050, 1053. He attacked the doctrine of privity of contract deciding that "irrespective of contract, the manufacturer of this thing of danger is under a duty to make it carefully."

During the subsequent years this decision was generally accepted in almost all of the American jurisdictions. Noel, *Retailers and Manufacturers*, 32 Tenn. L. Rev. 207, 226 (1965). The cases subsequent to *MacPherson, supra,* extended the rule in order to cover purchaser's employees, members of his family, and subsequent purchasers, even a pedestrian who is struck because of an automobile's defective brakes. See Prosser, *op. cit.* at p. 663 and cases cited therein and *The Assault Upon the Citadel (Strict Liability to the Consumer)*, *supra.*

Subsequent to the *MacPherson* case an endless number of theories were set up[4] to hold the manufacturer liable, obviat-

---

[4] Cornelius W. Gillam, *Products Liability in a Nutshell*, 37 Ore. L. Rev. 119, 153–55 (1958) where an exhaustive enumeration of the twenty-nine theories on the matter is made.

ing the inexistence of a contract between the latter and the plaintiff consumer. One of these exceptions and the most accepted one was the one of "implied warranty". In 1927 the Supreme Court of Mississippi set up this exception in the case of *Coca-Cola Bottling Works* v. *Lyons*, 111 So. 305 (1927). The Coca Cola's liability to a consumer who while drinking a Coca Cola swallowed some broken glass the latter contained, sustaining internal injuries, was at issue in that case. The Court stated on that occasion:

> "The recovery is based solely upon the theory that the Coca-Cola company was liable upon an implied warranty that the bottled drink was pure and wholesome, and that the fact that there was glass in the bottle when it was sealed and put upon the market for the public created liability for the injury to the one who drank it, regardless of whether the manufacturer was guilty of negligence or not.
>
> ". . . and that the manufacturer impliedly warranted the purity of the drink to such of the public as became the rightful possessor and owner of the Coca-Cola. Therefore, if the drink was injurious by reason of having glass in it, the bottling company was liable to the consumer."

Soon this exception turned into the most accepted one. In the last decade it has been virtually the only theory which has appeared outlined in the decisions. For about thirty years the majority of North American courts resort to the concept and at the same time exception of the "implied warranty" in order to uphold the manufacturers' liability to the consumers. *Madouros* v. *Kansas City Coca-Cola Bottling Co.*, 90 S.W.2d 445 (Mo. 1936); *Klein* v. *Duchess Sandwich Co.*, 93 P.2d 799 (Cal. 1939); *Nichols* v. *Nold*, 258 P.2d 317 (Kan. 1953); *B. F. Goodrich Co.* v. *Hammond*, 269 F.2d 501 (10th Cir. 1959); *La Hue* v. *Coca-Cola Bottling, Inc.*, 314 P.2d 421 (Wash. 1957).

What at the beginning was established as a possible solution to the previous privity requirement did not achieve the desired result in its practical application, because, as Prosser

says, of its hybrid and ambiguous nature. See Prosser, *The Assault Upon the Citadel, supra* at pp. 1126, 1127, where the difficulties confronted by the courts in applying the implied warranty doctrine are enumerated. And the truth was that in applying the implied warranty concept, what really was established was a rule of strict liability, since the implied warranty doctrine imposes upon the manufacturers and sellers the duty of providing a product fit for the use for which said product is designed and sold, in this case for human consumption. In accordance with this doctrine the person who manufactures, sells, or serves a food product for human consumption impliedly warrants that said product is wholesome and fit for human consumption. Prosser, *Strict Liability to the Consumer in California*, 18 Hastings L.J. 9, 16 (1966).

The rule of strict liability was gradually accepted in the cases of foods, although it was labeled implied warranty. The rule extended beyond foods for human consumption. It was extended to cases in which what was involved was food for dogs and fishes. *McAfee* v. *Cargill, Inc.*, 121 F.Supp. 5 (S.D. Cal. 1954); *Midwest Game Co.* v. *M. F. A. Milling Co.*, 320 S.W.2d 547 (Mo. 1959). The rule was also applied to cases of shampoo, hair dyes, detergents, soaps, and cigarettes respectively. *Graham* v. *Bottenfield's, Inc.*, 269 P.2d 413 (1954); *Rogers* v. *Toni Home Permanent Co.*, 147 N.E.2d 612 (Ohio 1958); *Hamon* v. *Digliani*, 174 A.2d 294 (Conn. 1961); *Kruper* v. *Procter and Gamble Co.*, 113 N.E.2d 605 (Ohio App. 1953); *Pritchard* v. *Liggett & Myers Tobacco Company*, 295 F.2d 292 (1961) (Reh. 350 F.2d 479 (1965)). See also, Annotation, 13 A.L.R.3d 1057 (1967).

In 1960 the Supreme Court of New Jersey decided the case of *Henningsen* v. *Bloomfield Motors, Inc.*, 161 A.2d 69 (1960), which although based on implied warranty, breaks the barrier of foods or products for intimate bodily use and holds an automobile manufacturer liable for defects in the

steering column of a Plymouth. When the steering column cracked, it caused the car to collide, causing injuries to the wife of its owner. In deciding, the court stated:

"We see no rational doctrinal basis for differentiating between a fly in a bottle of beverage and a defective automobile. The unwholesome beverage may bring illness to one person, the defective car, with its great potentiality for harm to the driver, occupants, and others, demands even less adherence to the narrow barrier of privity."

Once *Henningsen* was decided, the adoption of the strict liability doctrine became generalized.[5] This has been so mainly because of the fact that almost all of the scholars of this phase of the law hold that the rule of strict liability should be applied. The articles dealing with this matter are

---

[5] Prosser, in his last article *Strict Liability to the Consumer in California, supra,* enumerates the American jurisdictions which have adopted the strict liability rule, the states which have not adopted it and the ones which have adopted the rule by statute. To that effect he states:

"Twenty-two courts now accept the strict liability as to all products: *Arizona* (probably), *California, Connecticut, the District of Columbia, Florida, Illinois, Iowa, Kentucky, Michigan, Minnesota, Missouri, New Jersey, New York, North Dakota, Ohio, Oregon, Tennessee, Washington* (apparently) [although Prosser points it out as apparent, the rule has already been definitively adopted in the case of *Ulmer* v. *Ford Motor Co.,* decided by the Supreme Court of that state, on March 21, 1969, 37 L.W. 2576]. *Mississippi, Nevada,* and *Oklahoma* [did so subsequent to a previous article of Prosser, *The Fall of the Citadel,* 50 Minn. L. Rev. 791] ... [And] the last word from *Pennsylvania,* [was] in *Webb* v. *Zern,* 422 Pa. 215, 220 A.2d 853 (1966). ...

"In three jurisdictions federal courts, guessing at state law, have concluded that the liability will be accepted: *Indiana, Kansas, Vermont.*

"One court has intimated, without holding, that it will accept it: *Wisconsin.*

"In five states it has been adopted by statute: *Alabama, Arkansas, Colorado, Virginia, Wyoming.* ...

"In two states the development has not gone beyond products for intimate bodily use: *Hawaii, Louisiana.* ...

"In six it has not gone beyond food: *Nebraska, Puerto Rico* [he refers to two cases decided by the Federal District Court for Puerto Rico, *Coca-Cola Bottling Co.* v. *Negrón Torres,* 255 F.2d 149 (1st Cir. 1958); *Ponce de León* v. *Coca-Cola,* 75 F.Supp. 966]; *Utah.* ... There are food statutes in *Montana, South Carolina,* and *Rhode Island.* ... The Texas

annotated in the footnote.[6]

The Restatement, Torts Second in its § 402A (1965) also adopted the theory of strict liability. It provides:

"Special Liability of Seller of Product for Physical Harm to User or Consumer

"(1) One who sells any product in a defective condition

Courts of Civil Appeals are in disagreement, but the supreme court has not yet gone beyond food, although federal decisions have done so."
Recently, in the case of *Darryl* v. *Ford Motor Co.*, decided April 23, 1969 (37 L.W. 2629) the Supreme Court of Texas extended the rule and found a manufacturer of a truck with defective brakes liable to the passengers of a car which was struck by said truck. The Supreme Court of *Alaska* has also just adopted the strict liability rule in the cases of products in holding the manufacturer of a station wagon liable to a purchaser who sustained serious injuries on the brain as a result of a carbon monoxide leak. (See *Clary* v. *Fifth Avenue Chrysler Center, Inc.*, decided May 5, 1969 (37 L.W. 2629).)

Besides, at the present there are only eleven states which still insist on the privity or negligence requirement as basis for recovery. Although among those eleven only two have reiterated this position after the *Henningsen* case. These states are Delaware, Georgia, Idaho, Maine, Maryland, Massachusetts, New Hampshire, New Mexico, North Carolina, South Dakota, West Virginia (dictum).

[6] Freezer, *Manufacturer's Liability for Injuries Caused by His Products*, 37 Mich. L. Rev. 5 (1938); Note, *Sales—Liability of Manufacturer To Remote Vendee for Breach of Warranty*, 29 B.U. L. Rev. 107 (1949); Jeanblanc, *Manufacturers' Liability to Persons Other than Their Immediate Vendees*, 24 Pa. L. Rev. 134 (1957); R. Pound, *Problem of the Exploding Bottle*, 40 B.U. L. Rev. 167 (1960); Keeton, *Products Liability— Current Developments*, 40 Texas L. Rev. 193 (1961); *Products Liability Without Fault and the Requirement of a Defect*, 41 Texas L. Rev. 855 (1963); McCurdy, *Warranty Privity in Sales Goods*, 1 Houston L. Rev. 201 (1964); Jaeger, *How Strict Is the Manufacturer's Liability? Recent Developments*, 48 Marq. L. Rev. 293 (1964–65); Wade, *Strict Tort Liability of Manufacturers*, 19 Sw. L.J. 5 (1965); Noel, *Strict Liability of Manufacturers*, 50 A.B.A.J. 446 (1964); Steff, *The Exploding Bottle—Why Not Absolute Liability?*, 26 U. Pitt. L. Rev. 115 (1964-65); Hensel, *Food, Beverages, and Their Containers*, 20 Food Drug Cosm. L.J. 486 (1965); Freedman, *Defect in the Product: The Necessary Basis for Products Liability in Tort and in Warranty*, 33 Tenn. L. Rev. 323 (1966); Emroch, *Testimony and Proof in a Products Liability Case*, ABA Section of Insurance, Negligence and Compensation Law 172 (1966); Ostarch, *Strict Products Liability—Its Application and Meaning*, 21 Sw. L.J. 629 (1967); Witherspoon, *Torts or Warranties?*, XXXIX Miss. L.J. 199 (March 1968); Treatises: 2 Harper & James, Law of Torts 1570–74, § 28.16 (1956); Freedman, Allergy and Products Liability (1961 ed.).

unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

In the comment to this section it is stated at pp. 349–350 of the Restatement:

"On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products."

In Spain, in various decisions of the Supreme Court, a marked development toward the objective or strict liability is clearly observed. There is nothing in § 1902 of the Spanish Civil Code (1802 ours) to prevent it. Assimilating a previous legal trend the Judgment of October 30, 1963 stated:

". . . although our legislation has not expressly admitted the objective liability system, with respect to damages sustained by a third person, it is evident that both the doctrine and the jurisprudence in an increasing evolution are to acknowledge liability on the ground of the mere creation of perils for the

community, even disregarding the fault of the one liable and thus the judgment of March 25, 1954 . . . states that when the warranties adopted pursuant to the legal provisions in order to prevent and avoid the foreseeable and avoidable damages have not achieved a positive result, it reveals the inadequacy of the same and that something to be foreseen was missing, the diligence not being complete and being applicable to the extracontractual liability regulated in § 1902 *et seq.* of the Civil Code. . . ." (XXX-II Aranzadi, *Repertorio de Jurisprudencia* 4231 (1963).)

In the judgment of May 14, 1963 a recount is made of previous judgments in which the Spanish Supreme Court had determined liability under §§ 1902 and 1905 in the absence of fault or negligence. In this judgment, which dealt with the damages caused by some defective manufacturing installations, it is said:

". . . it is not true that the objective liability theory, has become stale and has been abandoned by the jurists, but that, on the contrary, it is an aspiration in the evolution of the modern law that man be liable for every damage, including not culpable damages which may happen as a consequence of his acts or of the things belonging to him or which are under his guard, even though he has proceeded with the necessary foresight and prudence, the delimitation of those cases which are forcing their way into some progressive Codes—theory of liability without negligence, of objective damage, of the juridical risk or of causality—being in full elaboration.

"That in regard to such a delicate problem, it should be noted that this Court, without openly favoring that theory of the objective liability, in some concrete cases, has admitted the obligation to idemnify damages, when the author thereof did not prove having proceeded with the due diligence; thus in the Judgment of October 19, 1909, it stated that the fact that an animal causes prejudice to persons or things, suffices to give rise to the liability of the owner, even without charging any fault or negligence against the latter; b) in the Judgment of January 12, 1928, it said that liability may arise 'even though in the commission of the—wrongful—acts there has been no fault or negligence on the part of the one bound to indemnify others for the

damage caused'; c) in the Judgment of July 10, 1945 (*Rep.* 879), it proclaimed that although the theory of objective liability in the damages caused by automobiles is not consecrated in our laws, this does not exclude that in certain cases negligence may be presumed and the wrongdoer may be charged with the obligation to overcome the presumption; d) in the Judgment of March 2, 1956 (*Rep.* 1139), it considered that having lawfully complied with all the statutory requirements to which he is bound cannot relieve the wrongdoer from liability when the reality predominates showing that the measures adopted did not have the proper effect; e) in the Judgment of April 3, 1957 (*Rep.* 1944), which reiterated the doctrine that 'the fact that an animal causes prejudice is sufficient to give rise to the objective liability of its owner, without requiring the existence of fault or negligence of the latter'; and f) in the Judgment of January 7, 1960 (*Rep.* 104), which stated again that for the requirement of liability mentioned in § 1902 'previous legality, pursuant to its text, is not necessary.'" (XXX-I Aranzadi, *op. cit. supra* 2699 (1963).)

Law commentators have also understood it so. See I-II Castán, *Derecho Civil Español, Común y Foral* 612 *et seq.* (10th ed. 1963); XXXI Scaevola, *Código Civil* 258, 261 (1961); Borrell Maciá, *Responsabilidades Derivadas de Culpa Extracontractual Civil*, Chap. II (2d ed. 1958); Santos Briz, *Derecho de Daños* 327–330 (1963 ed.), I Puig Peña, *Derecho Civil* 577 (1966 ed.).

Various reasons are adduced by the authorities in order to establish the manufacturer's strict liability:

(1) Reasons of public policy (human safety).

(2) The necessity of proving negligence places an unfair burden upon the prejudiced party.

(3) The imposition of strict liability should be an incentive for manufacturers toward the elaboration of safe products for consumption.

(4) Strict liability is what in fact is being applied although with another name.

(5) The manufacturer who is the original generator of the risk is in a better economical position to bear this result.

(6) The manufacturer is the one who induces to the consumption or use of his product, obviously indicating that his product is susceptible of such human consumption or use.

To that effect see, Roberts, *Leading Comment*, 27 Mo. L. Rev. 194 (1962) ; Prosser, On Torts, *supra* at p. 674.

■ Certainly the most equitable rule and the one of greatest congruence with the public policy is that of establishing the manufacturer's strict liability to the consumer. As Mr. Chief Justice Traynor stated in *Greenman* v. *Yuba* `Power Products, Inc.*, 377 P.2d 897, 901 (Cal. 1962) :

"The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves."

See also, Fleming James, Jr., *General Products—Should Manufacturers Be Liable Without Negligence?*, 24 Tenn. L. Rev. 923 (1957).

■ It is worthwhile to explain that although the consumer does not have to establish directly the manufacturer's negligence, the manufacturer is not the insurer of every damage his products may cause. *Greenman* v. *Yuba Power Products, Inc.*, *supra; Putman* v. *Erie City Manufacturing Co.*, 338 F.2d 911 (5th Cir. 1964). A bottling company is liable for the damages caused by a decayed mouse found in one of its bottles. Certainly it is not liable for the cavities that the sugar used in its beverages may cause. If the damage is not attributable to a defect of the product, there is no ground for applying the strict liability rule. See Traynor, *The Ways and Meanings of Defective Products and Strict Liability*, 32 Tenn. L. Rev. 363, 367 (1965) ;[7] 1 Hursh,

---

[7] In this article, the Chief Justice of California suggests the following definition for "defect": ". . . a defective product may be defined as one that fails to match the average quality of like products, and the manufacturer is then liable for injuries resulting from deviations from the norm."

American Law of Products Liability, §§ 5A-1-5A-6 (1969 Supp.).

The strict liability rule being the most reasonable and being consistent with the social needs of Puerto Rico and there being no provision in our code of laws militating against its adoption in our juridical sphere, it is proper that we adopt it in this jurisdiction.

The judgment will be reversed and another rendered granting the complaint ordering the defendant corporation to pay to the plaintiff the sum of $2,000 on account of damages sustained plus the sum of $500 for attorney's fees and costs.

